Frank **ASTER** et al., **Plaintiffs,**

v.

**BP OIL CORPORATION, Defendant.**

**Civ. No. 75–1019.**

United States District Court,
M. D. Pennsylvania.

April 14, 1976.

---

James F. McClure, Jr., McClure & McClure, Lewisburg, Pa., for plaintiffs.

Preston L. Davis, Davis, Davis & Kaar, Milton, Pa., Joseph A. Tate, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendants.

## OPINION

MUIR, District Judge.

The Plaintiffs, Frank Aster, William Crooks, Samuel L. Glantz, Allen Passerin, Elmer Propert, Alvin Rosenberg, and Joseph Ryan, doing business as co-partners, originally filed a suit in equity against the Defendant, BP Oil, on May 19, 1975 in the Court of Common Pleas for Northumberland County, Pennsylvania. On August 25, 1975, pursuant to 28 U.S.C. § 1441(b), BP removed the suit to this Court. The case was tried to the Court with an advisory jury from April 2 through April 7, 1976. The Court makes the following findings of fact.

## I. FINDINGS OF FACT

1. The tract of land which is the subject of this lawsuit is approximately one acre in size and is part of a fifty (50) acre tract situated at the Limestoneville interchange of Interstate 80 in Turbot Township, Northumberland County, Pennsylvania.

2. In late 1971, BP obtained an option to purchase this one acre tract and several adjacent acres from the then owners, Mr. and Mrs. Fred Stamm.

3. The 1971 option was never exercised because neither BP nor the sellers could provide water or sewage facilities to the tract.

4. The availability of the 50-acre tract of land for purchase was made known in 1972 to Mr. Allen Passerin, one of the Plaintiffs, by his attorney, H. William Koch, Esquire, who also represented Mr. and Mrs. Fred Stamm for purposes of selling the land.

5. On December 26, 1972, the Plaintiffs entered into an agreement to purchase the fifty (50) acre tract of land from the Stamms for the purpose of developing a motel complex on the site.

6. In February of 1973, Plaintiffs advised representatives of BP that they would be willing to sell one acre from the Stamm tract to BP for purposes of a gas station.

7. On or about February 16, 1973, for a consideration of $200, Allen Passerin, acting on behalf of all Plaintiffs, executed and delivered a written purchase option to BP for the one acre parcel of land situate in Turbot Township, Northumberland County, Pennsylvania, at a purchase price of $125,000.00.

8. Under the purchase option, if exercised, BP agreed to purchase the parcel of land provided the Sellers complied with the conditions stated in the option.

9. The purchase option of February 16, 1973 was on a standard printed form of BP.

10. The purchase option dated February 16, 1973, was prepared in its entirety by one or more agents of BP.

11. On or about March 20, 1973, Allen Passerin, on behalf of all Plaintiffs, executed and delivered to BP an amendment to said purchase option. (Uncontested)

12. The amendment of March 20, 1973 was prepared by an executive of BP and, by or at the request of Allen Passerin, contained an additional phrase to cover blasting if required.

13. By letter dated April 11, 1973, BP notified Plaintiffs that BP had elected to exercise said purchase option, as so amended. (Uncontested)

14. Upon execution and delivery of said Notice of Election, a purchase agreement

(hereinafter sometimes called the "Agreement") was created between Plaintiffs and BP. (Uncontested)

15. Said purchase agreement was constituted in its entirety by the purchase option dated February 16, 1973 and the amendment dated March 20, 1973.

16. On or about April 25, 1973, Plaintiffs took legal title to the fifty (50) acre tract of land. (Uncontested)

17. Plaintiffs remain at the time of trial owners as tenants in copartnership of the entire 50-acre tract, including the one-acre parcel, ownership not having changed since the conveyance to Plaintiffs.

18. The subject tract of land was surveyed by John S. Jacobs, Registered Professional Engineer, and a plot plan prepared. (The premises as described in said survey being hereinafter called the "premises"). (Uncontested)

19. Both parties accepted said survey for the purpose of the deed description to be used in closing the transaction embodied in the Agreement. (Uncontested)

20. In March of 1973, Mr. Passerin and John Dymond, the owner of the nearby Big "D" Truck Stop, discussed an arrangement whereby the tract of land could be connected to the Big "D" sewage treatment plant being designed and constructed by Envirosystems Corporation at the Big "D" Truck Stop.

21. In March of 1973, Messrs. Passerin and Dymond attended a meeting of the Turbot Township Municipal Authority and discussed with the members of the Authority a proposal whereby the Municipal Authority would lease the sewage treatment plant at the Big "D" Truck stop from Envirosystems and in turn, sublease the facility to Messrs. Passerin and Dymond, subject to the approval of the Pennsylvania Department of Environmental Resources ("D.E.R.").

22. On April 13, 1973, Samuel L. Glantz wrote BP, "We already have letters from the Sewer Authority granting permission to hook-in." (Defendant's 11)

23. Plaintiffs never received any letter from the Sewer Authority granting permission to hook-in.

24. On June 20, 1973, Mr. Passerin presented to the Turbot Township Municipal Authority a preliminary sewer layout for the 2,000 feet sewer pipeline to connect the tract of land to the Big "D" sewage plant. (Uncontested)

25. On June 20, 1973, the Turbot Township Municipal Authority approved the concept of leasing the Envirosystems Plant and subleasing the same to Dymond and others, subject to the treatment plant's meeting the criteria set by Herbert Associates, Inc., the Municipal Authority engineers.

26. On or about July 3, 1973, Allen Passerin, one of the Plaintiffs, entered into a contract with Herbert Associates, Inc. to provide all necessary engineering work to design a sanitary sewer extension from the premises in question to the existing treatment plant on the property of John Dymond. (Uncontested)

27. On July 16, 1973, D.E.R. issued Water Quality Management Permit No. 4973406 to Turbot Township Municipal Authority and approved the plans for construction of an extended aeration package-type sewage treatment plant with sand filtration and chlorination to serve the area of the Limestoneville I–80 interchange.

28. On September 6, 1973, Glantz wrote BP, "I wanted you to know that we are now in the process of the site preparation, that a building permit is now available and that we have received permission to tie into the existing sewer disposal plan (sic)". (Defendant's 15)

29. Plaintiffs never received permission to tie into the existing sewer plant.

30. On February 6, 1974, Passerin attended a meeting of the Turbot Township Municipal Authority and requested continuation of the planning for the sewage line from the tract of land to the Big "D" sewage plant and also for the expansion of the Big "D" sewage plant, even though at the date of the meeting he was unsure of

the early construction of a motel which the Plaintiffs planned to erect on their remaining parcel at the Limestoneville interchange. Passerin also requested the submission of those plans to D.E.R. for their approval.

31. A highway occupancy permit was issued by the Pennsylvania Department of Transportation to Turbot Township Municipal Authority on or about April 5, 1974 for said sewer extension to serve the premises.

32. Leonard A. Crosby, Chief, Compliance and Administration Section, Bureau of Water Quality Management, D.E.R., sent a letter dated May 7, 1974 to Turbot Township Municipal Authority and H. C. Herbert of Herbert Associates, Inc., which stated:

"Environmental Protection Technician Raymond D. Nuss inspected the sewage treatment plant at the intersection of Route I-80 and 254 near the Village of Limestone and reported the facilities to be operating satisfactorily on April 19, 1974.

"Permit number 4973406 issued to the Turbot Township Municipal Authority on July 16, 1973 has not been recorded in the Office of the Recorder of Deeds in Northumberland because the Authority engineers have not approved the plant for transfer to the authority.

"Based upon the cited inspection there appears to be no reason to delay the acceptance of the plant and the recording of the permit.

"Request that you advise this office when final action on this permit can be expected."

(Uncontested)

33. Herbert Associates performed, prior to June 8, 1974 all necessary engineering work for the design of a sanitary sewer extension to connect the Passerin premises to the existing package treatment plant at the Big "D" Truck Stop, as well as for obtaining the necessary highway occupancy permit. (Uncontested)

34. The cost of said engineering work, in the amount of $1,916.17, was billed to Allen Passerin, one of the Plaintiffs. (Uncontested)

35. At the June 19, 1974, meeting of the Turbot Township Municipal Authority, the Authority formally instructed Solicitor Koch to record the D.E.R. Permit No. 4973406 for the John Dymond sewage plant and to negotiate leases with Envirosystems, Inc., the owner of the plant, and with John Dymond, the user of the plant. (Uncontested)

36. Permit No. 4973406 for the plant serving the Big "D" Truck Stop of John Dymond was recorded December 2, 1974 in the Office for the Recording of Deeds in and for Northumberland County in Miscellaneous Book 36, at page 763. (Uncontested)

37. On the basis of the plans and specifications prepared by Herbert Associates, Inc., D.E.R. issued on November 18, 1974, to Turbot Township Municipal Authority Water Quality Management Permit No. 4974409 approving plans for construction of the sewer line to connect the premises of Plaintiffs to the existing package-type sewage treatment plant at the Big "D" Truck Stop. (Uncontested)

38. During the last several months of 1974 and the first few months of 1975, H. William Koch, Esq., the Solicitor for the Turbot Township Municipal Authority attempted to negotiate a lease to the Authority as lessee from Envirosystems as lessor of the sewage treatment plant serving John Dymond and attempted also to negotiate sub-leases from the authority to the users of the plant.

39. On December 3, 1974, BP official George A. Stanek requested that Glantz, provide further information with respect to the capacity of the sewer treatment plant at the Big "D" Truck Stop.

40. On December 12, 1974, H. William Koch, Esq., Solicitor for Turbot Township and Turbot Township Municipal Authority and also sometime counsel for the Stamms, former owners, and for Passerin, advised Glantz by letter of current negotiations

with Envirosystems Corporation concerning the existing package treatment plant serving the John Dymond property and stated: "It is my opinion that the present plant has ample capacity to include Cooper-Jarrett, Sunoco and BP without the necessity of any additional enlargement of the plant."

41. By letter of December 18, 1974, Glantz forwarded to Stanek a copy of the letter dated December 12, 1974 from H. William Koch, Esq., to Glantz.

42. Other than the letter of December 18, 1974, from H. William Koch, Esquire, Glantz never provided information with respect to the capacity of the sewer treatment plant at the Big "D" Truck Stop to the representatives of BP.

43. Earlier that year, on May 7, 1974, because of the delays experienced in obtaining approval of the Big "D" sewage plant, Mr. Passerin attended a meeting of the Turbot Township Supervisors and requested permission to use holding tanks as a means of waste disposal.

44. At that meeting, the supervisors directed their Solicitor, H. William Koch, Esq., to prepare an ordinance to permit holding tanks in Turbot Township. (Uncontested)

45. On June 4, 1974, the Turbot Township Supervisors enacted a holding tank ordinance. (Uncontested)

46. On June 13, 1974, Mr. Passerin submitted in BP's name an application to Turbot Township to permit the use of holding tanks on the site.

47. Passerin inserted in said application a daily sewage rate of 400 gallons with respect to the BP Tract.

48. No inquiry was made of BP by Passerin as to the expected daily sewage rate at the BP tract.

49. The expected daily sewage rate at the BP tract on peak days would have been between 1,000 and 1,300 gallons plus wash water which also would have gone into the holding tanks.

50. Passerin did not advise BP that he was making the application for use of holding tank or tanks.

51. Passerin did not act in good faith towards either BP or Turbot Township Municipal Authority when he filed said application for a permit for sewage holding tanks.

52. On June 24, 1974, Passerin obtained a contract price from R. C. Stahlnecker Co. to pump sewage from the holding tanks on the premises and dump the same at Milton Sewage Plant.

53. The holding tanks would have to be pumped out two or three times per week.

54. The cost of pumping out the holding tanks would be as much as $100 per week.

55. On July 19, 1974, sewer permit No. 239954 was issued by the Turbot Township Supervisors, on the basis that the information contained in the application for the permit was accurate and that said information satisfied the rules, regulations, and standards of D.E.R.

56. Permit No. 239954 was issued in the name of BP for installation of a holding tank as an on-site sewage disposal system to serve the premises. (Uncontested)

57. The permit was approved by D.E.R. on the basis of the information submitted in the application. (Uncontested)

58. Passerin inserted his own business address as the address of BP in the application for holding tanks and the sewer permit was consequently sent to his address.

59. By letter of July 29, 1974, Glantz mailed to Harry Davis, an employee of BP, a copy of sewer permit No. 239954 for the holding tank. (Uncontested)

60. Sometime in the latter part of June, 1974, the Turbot Township Building Inspector, at the request of Allen Passerin, issued Building Permit No. C2–146 in the name of BP. (Uncontested)

61. Said Building Permit No. C2–146 was for the construction of BP's service station on the premises.

62. A copy of the Building Permit was mailed by Glantz to BP, July 1, 1974. (Uncontested)

63. In August, 1974, BP applied to the Pennsylvania Department of Transportation for a highway occupancy permit, and the $10 permit fee for same was forwarded by BP to the Pennsylvania Department of Transportation in September, 1974.

64. On October 11, 1974, the Pennsylvania Department of Labor and Industry issued approval of BP's plans for the service station. (Uncontested)

65. Prior to October 25, 1974, Mr. Donald L. Coy, BP's engineer responsible for the site work, had obtained all additional necessary permits for construction of the gasoline service station, including the highway occupancy permit.

66. BP has a company policy against the use of sewage holding tanks.

67. BP determined that sewer permit No. 239954 was not satisfactory to BP.

68. BP advised the Plaintiffs many times in October, November, December, 1974 and in early 1975 that the sewer permit for holding tanks obtained by Passerin was not satisfactory to BP.

69. Mr. Stanek of BP rejected the sewer permit for holding tanks as not satisfactory to BP because the sewer permit was for a temporary, not permanent, sewer treatment system, was costly to operate, required regular attention, might be offensive to customers when being pumped and the layout on the application placed the holding tanks on the BP premises, in direct conflict to the agreement of the parties.

70. The dissatisfaction of BP with the sewer permit was in good faith and neither arbitrary nor capricious.

71. Mr. Stanek of BP advised Mr. Glantz of the reasons why holding tanks and the sewer permit for holding tanks were unsatisfactory to BP.

72. On or about June 7, 1974, with the exception of the water well, the premises were prepared as shown in the photographs identified as Exhibits P–29 through P–35. (Uncontested)

73. The levelling of the site was prepared to BP's specifications.

74. The existence of a great quantity of solid limestone rock on the premises required extensive blasting by Callenberger Construction Co. to level the site to the proper grade.

75. Coy visited the site for the first time after Callenberger had removed ⅔ of the limestone on the tract by blasting.

76. Coy did not give any approval for the blasting nor did he agree that BP would pay for it.

77. Callenberger billed Plaintiffs $9,000 for the blasting work. (Uncontested)

78. On November 7, 1974, Callenberger filed a Complaint against Plaintiffs in the Court of Common Pleas of Northumberland County (indexed to No. 470, Sept. Term, 1974) in assumpsit for the $9,000 blasting charge. (Uncontested)

79. On January 30, 1975, Plaintiffs filed a Complaint in said case against BP as Additional Defendant. (Uncontested)

80. On July 11, 1975, Judge Michael Kivko entered an Order in said case severing the matter of the alleged liability over of BP as the Additional Defendant. (Uncontested)

81. After a non-jury trial, Judge Kivko entered on August 15, 1975, an Order in favor of Callenberger and against the within Plaintiffs, Passerin, Glantz, et al., in the sum of $9,000 together with interest from June 7, 1974 and found that BP was not liable to Callenberger on that contract.

82. The Complaint against BP as the Additional Defendant in the above-referenced county court case is still pending. (Uncontested)

83. On September 30, 1975, Plaintiffs paid the judgment of the Northumberland

County Court in full in the amount of $9,757.57 calculated as follows:

a. Amount due for blasting
   & drilling      $9,000.00

b. Interest at 6% to 9/30/75      703.12

c. Prothonotary & Sheriff's
   costs      <u>54.45</u>
        $9,757.57

(Uncontested)

84. Wieand Brothers Well Drilling, Inc. completed drilling of a well on the premises in March of 1975 at a cost to Plaintiffs of $634.98. (Uncontested)

85. Said well is 73 feet deep, has 51'1" of casing and when drilled produced 30 gallons of water per minute. (Uncontested)

86. The well cap is shown in photographs identified as Exhibits P–29, P–30, P–34 and P–35. (Uncontested)

87. Philadelphia Title Insurance issued its title report on the premises, a copy of which report was forwarded by Glantz to BP, July 1, 1974. (Uncontested)

88. At no time relevant to this case has BP advised any of the Plaintiffs of defects in the title to the premises. (Uncontested)

89. From and after April 25, 1973, to and including the time of trial, Plaintiffs have been vested with fee simple title to the premises with good right to convey the same free and clear of any and all material liens, easements, restrictions and encumbrances of any nature whatsoever. (Uncontested)

90. By letter dated August 6, 1974, Glantz, acting on Plaintiffs' behalf, notified BP that settlement was scheduled for Wednesday, August 14, 1974, at 2:00 P.M. at Stewart Title, Southampton, Pa. (Uncontested)

91. This date was not viewed by Glantz as firm and he did not pursue it in the absence of a response from BP.

92. Settlement was not held August 14, 1974. (Uncontested)

93. Settlement was rescheduled by Glantz for Friday, October 18, 1974, at 11:00 A.M. at Robert Chalphin Associates, Inc., Southampton, Pa. and BP was so notified by Glantz by letters of October 9 and 14, 1974. (Uncontested)

94. Glantz considered this date to be firm despite no confirmation of it by BP.

95. Glantz appeared at the designated location but no representative of BP did so.

96. Settlement was not held October 18, 1974. (Uncontested)

97. Settlement was rescheduled by Glantz for Friday, October 25, 1974 and BP was so notified by letter of Glantz dated October 18, 1974. (Uncontested)

98. Glantz considered this date to be firm despite no confirmation of it by BP.

99. Glantz was present at the office of Robert Chalphin Associates, Inc., Southampton, Pa. on October 25, 1974, at 2:00 P.M., possessing a duly executed and acknowledged general warranty deed to the premises from Plaintiffs as Grantors to BP as Grantee.

100. BP was not represented by any person in attendance at the place of scheduled settlement at any time on October 25, 1974. (Uncontested)

101. At the times of the several respective closing dates, plaintiffs had not provided water or sewer services to the premises.

102. At the times of the several respective closing dates, all of which were set by Glantz, Glantz knew that Plaintiffs had not complied with the agreement of sale, particularly with respect to the sewer and the well.

103. Glantz, by letter of October 28, 1974, notified BP that Plaintiffs considered BP to be in default under the Agreement. (Uncontested)

104. On October 31, 1974, BP advised Plaintiffs that it would require full compliance with all conditions of the agreement before it would consummate the purchase.

105. At the meeting of December 3, 1974, Stanek again advised Glantz that the sewer permit for holding tanks was unsatisfactory to BP.

106. At the December 3, 1974, meeting, Stanek again advised Glantz that holding tanks were sewer systems unsatisfactory to BP.

107. During the period of August 14, 1974 to April 9, 1975, there existed no substantial likelihood that the premises in question, within a two-year period thereafter, could have and would have been provided sewage connection, at no cost to BP, to the existing package-type treatment plant on property of John Dymond under a sublease agreement with the Turbot Township Municipal Authority, had the Agreement been consummated and title transferred to BP.

108. Plaintiffs have, at all times relevant to this case, stood ready, willing and able to provide BP with a sign site and perpetual access easement, at no additional cost to BP, at such time as the site location was selected and BP indicated a readiness otherwise to consummate the transaction.

109. At no time relevant to this case has any employee or representative of BP notified any of the Plaintiffs of a desire to select the sign site.

110. At no time relevant to this case have the Plaintiffs notified BP of their desire to have BP select the sign site.

111. At no time prior to April 9, 1975, did any employee or representative of BP notify any of the Plaintiffs that any problem or dispute existed concerning the sign site or the perpetual easement providing access to the sign site.

112. On January 10, 1975, BP again advised Plaintiffs that all conditions of the contract between the parties, including the installation of a sewage system, must be fulfilled before BP would consummate the purchase.

113. On January 24, 1975, BP again advised Plaintiffs that all conditions of the contract between the parties, including the installation of a sewage system, must be fulfilled before BP would consummate the purchase.

114. During the months of October, November and December of 1974, and January of 1975, Glantz proposed various arrangements for closing, none of which included the actual installation of a sewage system.

115. During the months of October, November and December of 1974, and January of 1975, Glantz's proposals did not include an actual installation of a water well.

116. In March of 1975, in anticipation of litigation and not in a good faith effort to close, Plaintiffs installed a water well on the premises.

117. By letter of April 9, 1975, counsel for BP notified Glantz of BP's election to terminate the Agreement. (Uncontested)

118. One of the reasons, among others, that caused BP to terminate the agreement was that Plaintiffs had not installed a sewage system acceptable to the appropriate governmental authorities on other properties owned by Plaintiffs and had not connected BP to such system.

119. One of the reasons, among others, that caused BP to terminate the agreement was that Plaintiffs had not obtained all the permits which were necessary.

120. One of the reasons, among others, that caused BP to terminate the agreement was that the sewer permit which had been obtained by Plaintiffs was not satisfactory to BP.

121. As of April 9, 1975, Plaintiffs had not installed any sewage system on the premises in question.

122. As of April 9, 1975, Plaintiffs had not installed a sewage system acceptable to governmental authorities on any other properties owned by Plaintiffs or connected the BP premises to any sewage system.

123. As of April 9, 1975, Plaintiffs had not prepared and tendered to BP a grant of a perpetual easement for the installation and maintenance of a sign site.

## II. DISCUSSION

A 200' by 200' piece of property located at the intersection of Interstate 80 and

Route 254 in Turbot Township, Northumberland County, Pennsylvania, near the Village of Limestoneville, serves as the backdrop for this case. This site is part of a larger 50-acre parcel owned by the Plaintiffs. On February 16, 1973, the Plaintiffs and BP entered into a purchase option for this tract of approximately one-acre. On March 20, 1973, an amendment to the option was executed by the Plaintiffs and forwarded to BP. On April 11, 1975, BP exercised its option and created between itself and the Plaintiffs a purchase agreement.

At that time, the Plaintiffs, specifically Allen Passerin, already had under way efforts to provide sewage to this area. No sewage system, however, was ever installed.

In late 1973 and early 1974, the Plaintiffs had the site levelled to the specifications of the purchase agreement. In order to achieve the required grade, blasting was required.

Passerin secured in BP's name a permit for a holding tank sewage system, the contents of which would have to have been pumped into tank trucks several times each week.

Samuel L. Glantz, one of the Plaintiffs who was also their attorney, attempted to schedule closings for August 14, October 18, and October 25, 1974. No representative of BP agreed to those dates. The August 14 closing was not pursued by the Plaintiffs. However, on October 18 and October 25, Glantz was present at the location designated by him for settlement and was fully prepared to tender a valid deed. No representative of BP appeared on either occasion.

On October 31, 1974, BP advised the Plaintiffs that holding tanks as a sewage system were unsatisfactory, that the tanks did not meet the terms of the contract, and that all conditions of the agreement would have to be met before BP would complete the purchase.

On December 3, 1974, Glantz met with representatives of BP in an attempt to resolve differences between the parties and make firm commitments for consummation of the sale. BP again expressed its position on holding tanks. On January 10 and January 24, 1975, counsel for BP reiterated to Glantz by letter BP's position that the Plaintiffs' proposed arrangements for sewage at the site did not meet the conditions of the purchase agreement.

In March, 1975, the Plaintiffs, in anticipation of litigation, had a well drilled on the site. It is currently functioning and has a capacity of 30 gallons per minute.

On April 9, 1975, counsel for BP informed the Plaintiffs by letter that the purchase agreement executed April 11, 1973 was terminated because Plaintiffs had not complied with its conditions. The present lawsuit resulted.

The Plaintiffs make three requests for relief, each of diminishing magnitude. First, they request specific performance of the purchase agreement. Second, if specific performance is denied, they ask restitution for some or all of the expenses they incurred in attempting to comply with the terms of the agreement. Finally, they contend that BP agreed to pay, under any circumstances, for blasting required to level the site and, on that basis, seek reimbursement of some $9,000 which they have paid for blasting. The Court will discuss these requests *seriatim*.

A.  Specific Performance.

██ Although this case was originally filed in equity, to the extent that it seeks specific performance of the purchase agreement, it is, at least, quasi-contractual in nature. The Plaintiffs' demand for specific performance is "on the contract" and is based on their alleged substantial performance. The issue is whether the Plaintiffs complied with the contract or were in some way released from certain of its provisions.

In order to comply with the sewage requirements, the Plaintiffs originally envisioned connection to a plant owned by Envirosystems, Inc. located on the premises of the Big "D" Truck Stop diagonally across Route 254 from the site. Various problems and delays arose with respect to this plant

which made an imminent tie-in by the Plaintiffs or BP unlikely. Consequently, the Plaintiffs, in April or early May, 1974, unilaterally decided to pursue the possibility of installing holding tanks to serve the sewage needs of BP. On July 19, 1974, in response to a request by Plaintiff Passerin, the Turbot Township Supervisors issued, in the name of BP, a permit for the installation of holding tanks on the tract in question. On July 29, 1974, a copy of this permit was mailed to one Harry Davis, an employee of BP.

BP never lead the Plaintiffs to believe that their efforts with respect to sewage for the site were satisfactory. In fact, prior to July 29, 1974, BP had no idea that the Plaintiffs were contemplating holding tanks. BP advised the Plaintiffs many times in October, November, and December, 1974 and early 1975 that the sewer permit for holding tanks was unsatisfactory.

BP never waived either by word or action those provisions of the contract which require ". . . [that] necessary permits satisfactory to BP have been secured . . . ." and that the Plaintiffs ". . . install an acceptable sewage system to the appropriate governmental authorities (sic) on other properties owned by Seller and that Seller agrees to tie BP into said system at no additional cost to BP". Since there has been no actual compliance with these conditions of the contract—BP was dissatisfied with the holding tank permit and no sewage system was in fact in place on April 9, 1975—the Plaintiffs have the burden of demonstrating why this does not preclude their recovery.

The Plaintiffs argue that they have satisfied the "installation" requirement by substantial performance, i. e. by having completed all necessary arrangements for the holding tank system except for actually putting it in the ground. The Court is not so persuaded. However, even assuming *arguendo* that the "installation" proviso has been met, the Plaintiffs have nevertheless

not met the conditions of the "satisfaction" clause.

■■■ Thus, if BP's dissatisfaction is genuine, it is, in and of itself, adequate grounds for termination of the agreement. The test applied to a buyer's rejection under a satisfaction clause is not whether he ought to have been satisfied, *Jenkins Towel Service v. Tidewater Oil Company,* 422 Pa. 601, 606, 223 A.2d 84 (1966); *Hood v. Meininger,* 377 Pa. 342, 105 A.2d 126 (1954), but whether his dissatisfaction was real and not feigned or prompted by caprice or bad faith. *Jenkins Towel Service v. Tidewater Oil Company, supra; Hood v. Meininger, supra; Lippincott v. Warren Apartment Company,* 307 Pa. 320, 161 A. 330 (1932). BP rejected holding tanks because it believed they are temporary, expensive to operate, unsightly during removal of their contents, potentially unsanitary and require regular attention—all in contrast to a hookup to an operating sewage disposal system. The soundness of these opinions is not relevant. Only the genuineness with which they were taken is important. The Court is of the view that they were honestly held by BP and were not invoked capriciously or in bad faith. Also, the schematic drawing on the application for the holding tanks permit indicated that they were to be located beneath the site. This served as another legitimate ground for BP's dissatisfaction with the Plaintiff's sewage arrangements since the agreement required that any sewage treatment be on other property owned by the Plaintiffs.

■■■ A period of nearly two years from the execution of the agreement, April 11, 1973, to the date of its termination April 9, 1975, was a reasonable time for the Plaintiffs to comply with the provisions of the contract. BP Oil did not waive any provisions of the contract. The Plaintiffs were unable or unwilling to comply either substantially or in fact with the sewage installation or the satisfaction provisions of the agreement.[1] BP was entitled to full per-

---

1. The Court does not reach the sign site issue raised by the parties, except to note that BP did not attempt to select a site nor did the Plain-

tiffs attempt to elicit the selection or approval of a site by BP or tender a grant of easement therefor to BP.

formance by the Plaintiffs before any obligation arose which required BP to consummate the transaction. There was no substantial performance, let alone performance. Consequently, BP had valid grounds for termination and the Plaintiffs' request for specific performance will be denied.

## B. Restitution.

■ A cornerstone of equitable jurisprudence is that a party seeking equity must do so with "clean hands". *Gaudiosi v. Mellon,* 269 F.2d 873, 881 (3d Cir. 1959); *Hazel-Atlas Glass Company v. Hartford-Empire Company,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). Except in extraordinary circumstances, a party seeking equitable remedies who has not acted in "good faith" will be denied relief. *Root Refining Company v. Universal Oil Products Company,* 169 F.2d 514 (3d Cir. 1948); *Chris-Craft Industries, Inc. v. Independent Stockholders Committee,* 354 F.Supp. 895 (D.Del.1973).

The Plaintiffs did not make a good faith effort to comply with the agreement. Beginning in 1974, with no likelihood of installation or connection to an acceptable sewage system in sight, their efforts were directed almost exclusively toward forcing a favorable compromise of the purchase agreement rather than towards the installation of a sewage system satisfactory to BP. Furthermore, Plaintiff Passerin made no attempt to solicit BP's opinion on the acceptability of holding tanks as a means of waste disposal for the site prior to engaging in extended efforts to gain their approval by local authorities. He also inserted in the application for the holding tanks permit information as to anticipated daily sewage flow without having any knowledge of its accuracy. BP was never requested to verify the 400 gallon per day figure submitted by Passerin and, if it had been, would have provided a figure in excess of 1,000 gallons per day. In assessing an equitable Plaintiff's actions, there is no requirement that the Defendant be hurt by this conduct in order for equitable recovery by the Plaintiffs to be barred. *Gaudiosi v. Mellon, supra,* at 882.

BP exhibited no bad faith. It was remiss in failing promptly to respond to several phone calls by Plaintiff Glantz. However, the Court cannot infer from those omissions anything other than discourtesy and sloppy bureaucratic practice. There is nothing to indicate that BP intentionally evaded communication with the Plaintiffs or in any other way acted in bad faith.

Consequently, regardless of the merits of their claim, the Plaintiffs are precluded from recovery on equitable grounds by reason of their lack of good faith.

## C. Blasting.

■ The Plaintiffs contend that the March 20, 1973 amendment to the purchase option and an alleged oral agreement by an official of BP to pay for the blasting both obligate BP to pay for levelling the site. This is strictly a legal claim and is not barred by the doctrine of "unclean hands".

■ The Court is of the view that the amendment to the purchase option does not obligate BP to pay the blasting. BP did agree to pay for the blasting if the transaction was concluded. However, the Plaintiffs' contention that the amendment itself obligates BP to do so in the absence of a consummated sale is unfounded. The effect of the amendment is to allow the Sellers to prepare the site to the extent possible without blasting and still comply with the agreement. However, to interpret it as a covenant by BP to pay for any blasting which the Sellers might do in the preparation of the site runs contrary to the plain meaning of its words.

The Plaintiffs' contention that an official of BP approved the blasting prior to its inception and agreed to pay for it is also not supported. In the late winter or early spring of 1974, Coy, BP's site engineer, visited the premises. At that time, blasting was in progress and was nearly two-thirds complete. Coy made no representation to Passerin or the contractor doing the work that BP would pay for the blasting. Coy did not have the authority to do so and did not act outside his authority. There is no

credible evidence that BP ever agreed to pay for the blasting if the purchase agreement was not consummated.

In light of the foregoing, there is no ground upon which to base BP's liability for the blasting.

■ The Court is cognizant of the one-sidedness of the purchase option agreement. The agreement exposes the Sellers to a tremendous risk that, despite making large outlays, they would be unable to meet the stringent conditions of the contract. However, the Plaintiffs are experienced businessmen and one of their number is an attorney. They did not attempt to negotiate changes in the agreement aimed at reducing their risk. Now that BP has chosen to enforce the rigorous conditions of the contract, it is not this Court's function to undo or mitigate the consequences of that bargain in the absence of unconscionable and egregious conduct by BP. We find no such conduct on BP's part.

The Court reaches the following Conclusions of Law.

## III.  CONCLUSIONS OF LAW

1.  BP's rejection of holding tanks as an acceptable sewage system was not arbitrary and capricious.

2.  BP's rejection of the sewer permit 239954 for holding tanks as a permit on the ground that it was unsatisfactory to BP was not arbitrary and capricious.

3.  Plaintiffs have not fulfilled the conditions of the agreement.

4.  BP was entitled to full performance by Plaintiffs before any obligation arose which required BP to perform under the contract.

5.  BP did not waive any requirements of the contract.

6.  BP duly notified Plaintiffs that it would require that all necessary permits be satisfactory to BP prior to closing and gave Plaintiffs reasonable opportunity to comply with that condition of the agreement.

7.  Under the buy and sell agreement, BP was not required to consummate the purchase unless all necessary permits for developing the site, including sewer permit, were satisfactory to BP.

8.  Under the buy and sell agreement, BP was not required to consummate the purchase unless the Plaintiffs installed a sewage system acceptable to the appropriate governmental authorities on other properties owned by Plaintiffs and Plaintiffs tied BP into said sewage system at no additional cost to BP.

9.  Under the buy and sell agreement, BP was not required to consummate the purchase unless Plaintiffs drilled a water well to serve the one acre-tract.

10.  Under the buy and sell agreement, BP was not required to consummate the purchase unless Plaintiffs furnished at no additional cost to BP a sign site on other properties owned by Plaintiffs.

11.  BP's termination of the agreement was in good faith and was not arbitrary and capricious.

12.  The period April 11, 1973 to April 9, 1975 was a reasonable period of time within which the Plaintiffs should have complied with the conditions of the contract.

13.  The Plaintiffs were unable or unwilling to comply with the conditions of the contract during said period.

14.  The Plaintiffs had no contract with R. C. Stahlnecker for the disposal of the contents of the holding tanks.

15.  BP did not agree to pay blasting bills in the event that the buy and sell agreement was not consummated.

16.  BP was responsible for the blasting bills only if the buy and sell agreement was consummated.

17.  The Plaintiffs lack "clean hands".

18.  The Plaintiffs are not entitled to restitution for the expenses they incurred in attempting to prepare the site.

19.  BP has no further obligation under the agreement.

20. Plaintiffs are not entitled to specific performance of the terms of the agreement by BP.

An appropriate order will issue.