840 F.2d 173
 Joseph L. CASTLE, II, Alan M. Feldman, Miguel A. Mora and
Robert S. Seltzer, Trustees of the Psychiatric Hospitals of
America, Inc. Employee Stock Ownership Plan and Retirement
Plan Committee of the Psychiatric Hospitals of America,
Inc., Employee Stock Ownership Plan
v.
Robert M. COHEN, Hartsell, Inc., Cheyenne Corporation and
Roland M. Jermyn, Jr. (Three Cases).
Appeal of Robert M. COHEN, Hartsell, Inc. and Cheyenne Corporation.
Appeal of Roland M. JERMYN, Jr.
 Nos. 87-1662, 87-1669, 87-1677.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 7, 1988.
Decided Feb. 11, 1988.
 
 Harold E. Kohn, Robert A. Swift (argued), Kohn, Savett, Klein & Graf, P.C., Gregory T. Magarity, James G. Wiles (Argued), Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Robert M. Cohen, Hartsell, Inc., Cheyenne Corp. and Roland M. Jermyn, Jr.
 J. Clayton Undercofler, III, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for Joseph L. Castle, II, Alan M. Feldman, Miguel A. Mora and Robert S. Seltzer, Individually and as Escrow Agents.
 Marc Durant (argued), Robert M. Wolff, Karen S. Berger, Marc Durant & Associates, Philadelphia, Pa., William P. Frank, Jay S. Berke, Skadden, Arps, Slate, Meagher & Flom, New York City, for Trustees of the Psychiatric Hospitals of America, Inc. Employee Stock Ownership Plan.
 James J. Binns, Philadelphia, Pa., for Psychiatric Hospitals of America, Inc. and the Retirement Plan Committee.
 Before GIBBONS, Chief Judge, and HUTCHINSON and GARTH, Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 In this appeal we are called upon to interpret a complex stock purchase agreement. The purchasers brought an action in the district court with claims premised upon various federal statutes. The complaint also sought specific performance and resolution of a number of pendent and ancillary state claims. In their answer, the sellers posited a host of counterclaims founded upon both state and federal law. The trial court had jurisdiction under 28 U.S.C.A. Sec. 1331 (West Supp.1987). We have jurisdiction over this appeal from a final order. 28 U.S.C.A. Sec. 1291 (West Supp.1987). We will affirm the district court's order, 676 F.Supp. 620, granting specific performance of the disputed contract. However, we will vacate the trial court's decree dismissing the remaining claims.
 
 
 2
 * Appellants at Nos. 87-1662 and 87-1677, Robert M. Cohen, Hartsell, Inc., Cheyenne Corp. and Roland M. Jermyn, Jr. (stockholders), are the owners of a 56.2% interest in the Psychiatric Hospitals of America, Inc. (PHA). Joseph L. Castle, II, Alan M. Feldman, Miguel A. Mora and Robert S. Seltzer (trustees) are the trustees of PHA's Employee Stock Ownership Plan (ESOP).[1] On December 4, 1984, Mr. Cohen, the owner of 250,000 shares of PHA, pleaded guilty to Medicare fraud. The guilty plea threatened PHA's ability to secure Medicare reimbursements. See 42 U.S.C.A. Sec. 1320a-7(c) (West Supp.1987); 42 C.F.R. Sec. 489.12 (1986). To insure the continuing flow of government funds, the trustees sought to acquire the stockholders' shares for the benefit of the ESOP.
 
 
 3
 On January 31, 1985, the parties executed the "Stock Sale Agreement" which is the basis of this lawsuit. The contract states that the defendant/appellant majority stockholders "hereby sell to the Trustees and the Trustees hereby purchase from the Stockholders all of the Offered Shares at the price and upon the terms and conditions hereinafter set forth, subject only to the Alternative Valuation procedure." Joint Appendix of defendant/appellants (Def.App.) at 144a. Pending the determination of the value of the shares and their transfer to the buyer, the shares were to be held in escrow. Id. at 144a-145a.
 
 
 4
 The agreement provided a method for determining the price of the stock. First, the trustees were to select an independent appraiser to determine the fair market value of the stock as of January 31, 1985. The purchase price was to reflect the sum of both this appraised value plus interest from January 31, 1985 to the date of delivery of the shares from escrow and the transfer of title to the trustees for the ESOP. Id. at 146a. If the trustees' price was unacceptable, the selling stockholders could invoke the "Alternative Valuation" procedure.
 
 
 5
 The alternative procedure contemplated an "appraisal period" equal to the time available to the trustees to secure their appraisal plus a reasonable time as needed by the stockholders' appraiser to prepare his alternative report. Id. at 148a. In the event the stockholders' appraisal was higher than the trustees', the agreement further provided: "If during the Appraisal Period, the Stockholders' appraiser shall determine a fair market value for the Offered Shares as of the Effective Date which valuation exceeds the Appraised Value [i.e., that price tendered by the trustees] by more than 10% (the "Higher Appraised Value") or if Stockholders prior to the end of the Appraisal Period shall obtain a written offer from an unrelated third party which offer exceeds the Appraised Value by more than 10% (the "Higher Offer"), the Stockholders shall not be required to accept the ESOP Purchase Price for the Offered Shares." Id. The stockholders then could elect to receive the higher appraised value from the trustees, if the trustees were willing to pay it, or, if not, they could sell to the unrelated third party for his higher offer. Id. at 148a-149a. In short, the trustees enjoyed a right of first refusal over any such sale to a third party. Id. at 150a. Lastly, should a sale to an unrelated third party be consummated, the trustees were entitled to receive the amount by which the sale to the third party exceeds the stockholders' valuation. Id. at 153a-154a.[2]
 
 
 6
 Shortly after the execution of the January 31, 1985 agreement, the trustees retained the firm of Marshall & Stevens to appraise the stock. On August 7, 1985, Marshall & Stevens submitted its appraisal of $13.1 million to the trustees. John Poole, the stockholders' appraiser, determined that the value of the stock as at January 31, 1985, the date of the contract, was $39 million. The stockholders' valuation was communicated to the trustees some time in August of 1986. Each party sharply assails the integrity of the other's appraisal.
 
 
 7
 On February 27, 1987, the stockholders executed a stock purchase agreement purportedly conveying the disputed shares to the Ramsay Hospital Corporation of Pennsylvania (Ramsay). In consideration of the transfer of the controlling shares of PHA to Ramsay, Ramsay agreed to pay the stockholders approximately $28 million.[3]
 
 
 8
 Shortly thereafter, on March 11, 1987, the trustees filed a complaint against the stockholders, alleging a host of violations of federal and state law stemming from the failure of the stockholders to consummate the transfer of the shares to the ESOP and the proposed sale to Ramsay.[4] The complaint also sought a declaratory judgment pursuant to 28 U.S.C.A. Sec. 2201 (West Supp.1987) declaring (1) a breach of the agreement for sale of the stock, (2) that both the stockholders' appraisal and the agreement to transfer the shares to Ramsay were violative of the stock sale agreement and (3) that the trustees be empowered to complete the purchase of the stock. The trustees also sought specific performance of the agreement. In their answer, the stockholders denied the averments of the trustees' complaint and raised numerous counterclaims premised upon federal and state law.[5]
 
 
 9
 The district court, pursuant to Fed.R.Civ.P. 42(b), severed the contract claim from the remaining issues raised by the parties. The issues pertaining to the contract dispute were submitted to a jury. In response to special interrogatories, the jury found that (1) the stockholders' appraisal was not submitted in conformity with the January 31, 1985 agreement, (2) the trustees' appraisal was not submitted in conformity with that same agreement and (3) the fair market value of the 56.2% majority interest in PHA on January 31, 1985 was equal to $15.8 million.[6]
 
 
 10
 In fashioning its order, the trial court substituted the jury's valuation of the stock for the $39 million appraisal tendered by the stockholders and the $13.8 million tendered by the trustees. The district court then ordered that the plaintiff trustees be entitled to complete the purchase of the shares at a price of $15.8 million, plus interest. In an earlier order, this court denied the stockholders' motion for injunctive relief pending appeal. We agreed to expedite our consideration of this matter.
 
 
 11
 The stockholders then filed a motion to alter or amend the judgment in the district court. See Fed.R.Civ.P. 59(e). The stockholders asked the district court to allow them to sell the stock to Ramsay should the trustees fail to tender payment by October 10, 1987. In an order dated October 26, 1987, the district court set March 31, 1988 as the final date by which the trustees should consummate the deal at the price fixed by the jury. Under the order, if the trustees fail to tender the money by that date, the stockholders will be free to sell the stock to a third party. The trial court also ruled that such a sale to a third party must be for an amount greater than $15.8 million and that the proceeds of the sale must be held in escrow pending the final resolution of the matter. This appeal followed.
 
 II
 
 12
 The stockholders contend that the trial court ignored the jury's verdict in granting the trustees specific performance of the stock sale agreement. According to the stockholders, the jury's finding that the trustees' valuation did not reflect the fair market value of the stock as of January 31, 1985 conclusively establishes the trustees' failure to meet a condition precedent to the stockholders' performance of their promise to sell under the agreement. In other words, they contend that the jury's valuation of the stock at a figure $2.7 million in excess of the trustees' appraisal establishes the trustees' failure to tender the price (fair market value of the stock as of the date of the agreement) set by the contract of sale. Since the trustees' appraisal was more than 10% under the jury's valuation, they argue a condition precedent to the obligation to finally transfer the stock to the trustees has not been satisfied and the stockholders are accordingly free to sell the stock to an unrelated third party. We do not agree.
 
 
 13
 Our review of the district court's construction of the agreement is plenary. John F. Harkins Co. v. Waldinger Corp., 796 F.2d 657, 659 (3d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987); Ram Constr. Co. v. American States Ins. Co., 749 F.2d 1049, 1053 (3d Cir.1984). In exercising that review, we are guided by a number of well-established contract principles. Our paramount consideration is, of course, the intent of the parties. Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009 (3d Cir.1980); Hutchison v. Sunbeam Coal Corp., 513 Pa. 192, 200, 519 A.2d 385, 389 (1986). A court must adopt the construction which ascribes a reasonable, probable and natural consequence to the conduct of the parties. Unit Vending Corp. v. Lacas, 410 Pa. 614, 617, 190 A.2d 298, 300 (1963); Schoenkopf v. Brown & Williamson Tobacco Corp., 483 F.Supp. 1185, 1196 (E.D.Pa.), aff'd, 637 F.2d 205 (3d Cir.1980).
 
 
 14
 Our reading of this agreement convinces us that the parties intended to transfer the 56.2% interest in PHA to the trustees of the ESOP. It recites that it is the purpose of the trustees to create a leveraged Employee Stock Ownership Plan as defined by the Internal Revenue Code. Def.App. at 142a. See also 26 U.S.C.A. Sec. 4975(e)(7) (West Supp.1987). It states that the "Stockholders hereby sell to the Trustees and the Trustees hereby purchase from the Stockholders all of the Offered Shares at the price and upon the terms and conditions hereinafter set forth, subject only to the Alternative Valuation procedure set forth ... below." Id. at 144a. Additionally, it sets the closing date as "at the execution of this Agreement." Id. These passages, speaking on January 31, 1985 in the present tense, suggest that it was the intent of the parties to convey the stock necessary to the operation of the ESOP to the trustees immediately, leaving the determination of the price to a later date. The fact that the trustees' independent appraiser did not value the stock within 10% of the jury's value does not relieve the stockholders of all further obligations under the contract. Basic principles of contract law regarding conditions precedent support this reading.
 
 
 15
 A condition is defined as an act or event which "must occur before a duty of performance under an existing contract becomes absolute." J. Calamari & M. Perillo, The Law of Contracts Sec. 11-3 (2d ed. 1977). Under Pennsylvania law, a condition precedent must be expressed in clear language or it will be construed as a promise. Mellon Bank, 619 F.2d at 1016; Britex Waste Co. v. Nathan Schwab & Sons, 139 Pa.Superior Ct. 474, 483-84, 12 A.2d 473, 478 (1940). Since the failure to comply with a condition precedent works a forfeiture, such conditions are disfavored. Restatement (Second) of Contracts Sec. 227 comment b (1981). The agreement before us is unclear as to whether the trustees' valuation is a condition precedent to the stockholders' obligations under the agreement. It should therefore be considered a promise rather than a condition precedent. "Breach of promise subjects the promisor to liability in damages, but does not necessarily excuse performance on the other side. Breach or non-occurrence of a condition prevents the promisee from acquiring a right, or deprives him of one, but subjects him to no liability." 5 S. Williston, A Treatise on the Law of Contracts Sec. 665 (3d ed. 1961). The trustees' failure to tender an accurate valuation breached a promise under the agreement. Therefore, the trustees are liable to the stockholders for the damage award set by the jury. The stockholders are not excused from performing.
 
 
 16
 This construction harmonizes the jury's verdict with the agreement. Although the jury rejected both parties' appraisals, it set the fair market value of the stock at $15.8 million. If it is upheld, the difference between the trustees' and the jury's valuations, $2.7 million, is made payable to the stockholders and gives them full damages for the trustees' breach of the agreement if a valid appraisal is construed as a promise. Recently, in IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118 (3d Cir.1986), we held that a contract for the sale of securities, which does not include a price term, will not fail for want of consideration. As in Barker & Williamson, we adopt the "modern view" embodied in the Uniform Commercial Code, which states that a contract is enforceable despite an open price term. Id. at 124. See also 13 Pa.Cons.Stat.Ann. Sec. 2305 (Purdon 1984). Here, the jury set the open price term.
 
 III
 
 17
 Relying on its equitable powers, the district court granted the trustees specific performance of this agreement for the sale of stock. As evidence of nefarious conduct by the trustees, which should equitably bar the remedy of specific performance, the stockholders cite the jurors' rejection of the trustees' valuation of the stock. See supra note 6. According to the stockholders, because the jury rejected both appraisals, the trustees' conduct is on the same plane as that of the stockholders. Therefore, they argue, the trustees' alleged unclean hands should not open the doors of equity. We do not agree.
 
 
 18
 If there is no adequate remedy at law, a court of equity may, in its discretion, grant specific performance. Portnoy v. Brown, 430 Pa. 401, 243 A.2d 444 (1968). It is a cornerstone of equitable jurisprudence that a party seeking an equitable remedy must do so with "clean hands." Gaudiosi v. Mellon, 269 F.2d 873, 881 (3d Cir.), cert. denied, 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959). Simply stated, "clean hands" means good faith. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814-15, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945); Root Ref. Co. v. Universal Oil Products Co., 169 F.2d 514, 541 (3d Cir.1948), cert. denied, 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444 (1949); Aster v. BP Oil Corp., 412 F.Supp. 179, 190 (M.D.Pa.1976), aff'd, 549 F.2d 794 (3d Cir.1977); see also In re Pedrick, 505 Pa. 530, 544, 482 A.2d 215, 222 (1984).
 
 
 19
 Here, the district court specifically found that there was no unethical or fraudulent conduct on the part of the trustees in procuring their appraisal. Plt.App. at A34.[7] However, the trial court suggested that it is the stockholders whose hands are soiled by a grossly excessive appraisal. Id. at A19. Mindful of the chancellor's discretion and our consequent limited scope of review on this issue, we cannot conclude after reviewing the record that the district court's finding on this point is clearly erroneous.
 
 
 20
 The stockholders also argue that specific performance is not warranted since the trustees have not demonstrated that they are ready, willing and able to perform their obligations under the stock purchase agreement. While a court at law usually issues an unconditional judgment, a court of equity may, in its discretion, condition its decree on some performance by the plaintiff. "The decree will protect the defendant's substantial rights by making any order for his performance conditional on concurrent action by the plaintiff...." 6 S. Williston, A Treatise on the Law of Contracts Sec. 834 (3d ed. 1962).[8] Here, the district court's order simply requires the trustees' payment before the sale will be consummated. Should the trustees fail to tender such payment, the stockholders will be free to convey the shares to any third party. We see no reason to interfere with the district court's discretion in this regard.
 
 IV
 
 21
 Prior to the trial on the contract issue, the district court entered an order granting the trustees' motion to dismiss the stockholders' counterclaim based upon the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. Secs. 1961-1968 (West 1984 & Supp.1987). In its later opinion, the trial court considered evidence adduced at trial to buttress its dismissal of the RICO counterclaim. The court apparently reconsidered the issue as a motion for summary judgment under Rule 56. The RICO claim was then summarily dismissed without giving the parties the benefit of notice or hearing. The district court's failure to afford the stockholders an opportunity to contest the granting of summary judgment was error. Therefore, we must vacate the summary judgment order and remand for a hearing on the RICO counterclaim.[9]
 
 Rule 12(b) states, in pertinent part:
 
 22
 If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
 
 
 23
 Fed.R.Civ.P. 12(b). Once a court converts a 12(b)(6) motion into a motion for summary judgment under Rule 56, a party must be put on notice so it can exercise its right to oppose the granting of summary judgment. Crown Cent. Petroleum Corp. v. Waldman, 634 F.2d 127, 129 (3d Cir.1980); Bryson v. Brand Insulations, Inc., 621 F.2d 556, 559 (3d Cir.1980); see also Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 267 (1986) (a trial court's sua sponte granting of summary judgment is proper so long as the opposing party had notice and an opportunity to come forward with evidence); Cowgill v. Raymark Industries, 780 F.2d 324 (3d Cir.1985) (distinguishing cases in which a party has filed a motion for summary judgment from those in which the court converts a motion on the pleadings into one for summary judgment).
 
 
 24
 In the instant case, the district court stated that it intended to try the severed issues after trial of the contract claim. After the contract issue was adjudicated, the district court entered summary judgment on all of the remaining claims. Here, as in Bryson, "[t]he other issues were swept away in the undercurrent of the one issue on which the court focused." 621 F.2d at 557. Accordingly, we must vacate the district court's order dismissing the RICO counterclaim and remand the matter so that the parties opposing the summary judgment can be given an opportunity to resist it. The district court must also afford both parties an opportunity to oppose judgment on the remaining claims.[10] See note 5, supra.
 
 V
 
 25
 In its order and decree of October 26, 1987, the district court gave the trustees until March 31, 1988 to consummate the purchase of the stock at a price of $15.8 million plus interest. Should the trustees prove unable to tender payment by that date, the stockholders would be free to sell the stock to any third party. The district court also ordered that, should the sale of the stock to a third party be consummated, the sale price be held in escrow pending final resolution of this and all related litigation. In their cross-appeal, the trustees contend that the March 31 deadline will not afford them an adequate opportunity to acquire the financing necessary to complete the purchase. These concerns may be real, since the Perpetual Savings Bank's commitment to provide financing for the leveraged buyout the agreement contemplates, has a condition concerning continuing litigation which may obviate the commitment if this litigation is not wholly concluded. Condition 2 of the Perpetual Savings Bank's commitment letter of December 2, 1987 appears to condition Perpetual's obligation on the outcome of this litigation.[11] Since the parties presented the commitment but did not address the construction of the provision on appeal to us, we express no opinion on the effect the district court should, or may wish to, give it in exercising its equitable power to frame an appropriate decree consistent with this opinion.[12]
 
 
 26
 It is axiomatic that the fashioning of an equitable decree is within the discretion of the chancellor. "The objective of the court in granting equitable relief is to do complete justice to the extent that this is feasible." Restatement (Second) of Contracts Sec. 358 comment a (1981). As discussed above, the order entered in this case insures the trustees the benefit of their bargain while encouraging the arrangement of prompt financing. In light of the need for a remand on the remaining issues, the district court may, in its discretion, modify its decree to incorporate any additional time necessary for litigation of the outstanding issues and to protect its own decree by providing a reasonable time for the trustees to satisfy the financing. Moreover, consistent with our disposition of the contract issue, the escrow provision included in the district court's October 26, 1987 order may no longer be necessary. See Plt. App. at A40-A41. In any event, modification of the October 27, 1987 order is left to the sound discretion of the district court.
 
 
 27
 Accordingly, the trial court's order pertaining to the contract issue will be affirmed. The record in this appeal and cross-appeal will be remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 The trustees have filed a cross-appeal at No. 87-1669
 
 
 [2]
 The agreement states that it shall be governed by and construed in accordance with Pennsylvania law. Def.App. at 162a
 
 
 [3]
 We agree with the district court that we need not consider the proposed sale to Ramsay as an offer within the appraisal period. The appraisal period ended after the stockholders enjoyed as much time as the trustees to secure an appraisal plus a reasonable period for their appraiser to value the stock. The trustees' appraiser needed about six months to do his appraisal, i.e., January 31, 1985 to August 7, 1985. The stockholders' appraisal was completed in August of 1986. The contract with Ramsay was executed on February 27, 1987, long after the end of the appraisal period. The period was not tolled, contrary to the argument made by the stockholders, to the effect that the trustees never submitted a "valid" appraisal. As will be discussed infra, the trustees' valuation comported with their obligations under the contract
 
 
 [4]
 Specifically, the complaint alleged violations of Sec. 10(b) of the 1934 Securities Exchange Act, 15 U.S.C.A. Sec. 78j (West 1981); Secs. 404 and 406 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C.A. Secs. 1104, 1106 (West Supp.1987); breach of contract; breach of implied covenant of good faith and fair dealing and common law fraud. Def.App. at 8a-61a
 
 
 [5]
 The counterclaims included a claim for a declaratory judgment stating that (1) the stockholders' appraisal was valid; (2) the trustees waived their right to purchase the shares and (3) the selling stockholders are entitled to have the shares delivered to the Ramsay group. The counterclaim also asserted violations of Sec. 10(b) of the 1934 Securities Exchange Act, breach of contract, breach of fiduciary duties and waste of corporate assets and mismanagement, tortious interference with advantageous business and contractual relations and unfair competition. Lastly, the counterclaim asserted a violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C.A. Secs. 1961-1968 (West 1984 & Supp.1987)
 
 
 [6]
 The interrogatories were framed as follows:
 
 
 [1]
 Have the plaintiffs (Joseph L. Castle, II, Alan M. Feldman, Miguel A. Mora and Robert S. Seltzer) proved by a preponderance of the evidence that the Poole Appraisal was not submitted in conformity with the requirements and standards of the January 31, 1985 Stock Sale Agreement?
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 If your answer is "no", return to the Courtroom. (If your answer is "yes", proceed to # 2).
 
 
 [2]
 Have the plaintiffs proved by a preponderance of the evidence that the Marshall & Stevens Appraisal was submitted in conformity with the requirements and standards of the January 31, 1985 Stock Sale Agreement?
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 If your answer is "yes", return to the Courtroom. (If your answer is "no", proceed to # 3).
 
 
 [3]
 What was the fair market value of the 56.2% block of stock in PHA on January 31, 1985?
 $______
 Plaintiffs/Appellees' Supplemental Appendix (Plt.App.) at A5. The jury answered "yes" to number 1, "no" to number 2, and determined the fair market value of the 56.2% majority interest as of January 31, 1985 to be $15.8 million. Id. at A6.
 
 
 [7]
 The district court made these findings on issues not submitted to the jury, consistent with Fed.R.Civ.P. 49(a). Such findings are subject to the clearly erroneous standard of review. Bruno v. Western Elec. Co., 829 F.2d 957, 961-62 (10th Cir.1987). The stockholders challenge the "phantom" findings of the trial judge on these issues not submitted to the jury. Since the stockholders sought expedited appellate review of this matter, the trial court filed its opinion after its order. We now enjoy the benefit of Judge Cahn's excellent opinion and we will rely on the findings therein
 
 
 [8]
 See also United States v. Bedford Assoc., 618 F.2d 904, 919 (2d Cir.1980), cert. denied, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982), wherein the court, quoting the Restatement of Contracts Sec. 375 comment c (1932), stated:
 If specific performance is decreed in favor of a plaintiff who is himself in some default, complete justice requires that the defendant should not be compelled to perform without in the same proceeding compensating him for his injury.... Sometimes it may be necessary to require money payment by the plaintiff and to make the decree conditional on such payment.
 
 
 [9]
 Judge Garth does not agree that the district court converted the motion to dismiss the Shareholders' RICO counterclaim to a summary judgment motion. In Judge Garth's view, the motion which was filed by the Trustees prior to the trial was addressed solely to the pleadings and thus did not present the issue in a summary judgment context
 On August 14, 1987, prior to trial, the district court granted the Trustees' motion, finding the pleadings insufficient to state a claim under RICO, 18 U.S.C. Secs. 1961 et seq. In so ruling, Judge Garth believes that the district court did not offend the holding of Barticheck v. Fidelity Union Bank, 832 F.2d 36, 38-40 (3d Cir.1987), or the principles pertaining to the dismissal of a RICO claim as set forth therein. Although Barticheck was decided on October 29, 1987, which was after the district court's August 14, 1987 order of dismissal had issued, the district court had the benefit of Barticheck when it drafted its December 8, 1987 opinion. In its pre-Barticheck order, and the analysis in its post-Barticheck opinion, Judge Garth is satisfied that the district court's ruling comports with the Barticheck analysis and is consistent therewith.
 While it is true that the district court judge did refer to the trial proceedings in his post-trial opinion filed on December 8, 1987, Judge Garth reads this reference as no more than an additional, but non-essential, argument which serves to buttress the district court's earlier holding that the RICO claim was flawed. Hence, Judge Garth disagrees with the majority's remand of the RICO counterclaim and instead would affirm the district court's dismissal of that counterclaim and would not require any further proceedings on remand in connection therewith.
 
 
 [10]
 In so holding, we make no comment on the vitality of the stockholders' RICO claim or any of the remaining claims. Moreover, the district court is to consider this opinion and the issues determined by it in the contract dispute in the disposition of the RICO and other remaining claims, under the law of the case doctrine. See, e.g., Todd & Co., Inc. v. S.E.C., 637 F.2d 154 (3d Cir.1980)
 
 
 [11]
 Perpetual's obligation is subject to the condition that:
 (2) Castle v. Cohen, Civ. No. 87-1402 (E.D.Pa.) and any other litigation involving the Borrower's legal right to purchase the Shares or calling into question the ownership of any of the Shares shall have been finally terminated (by dismissal of all appeals with prejudice, or final non-reviewable decision in favor of the Borrower) and all questions regarding ownership of the Shares shall have been resolved to the satisfaction of Perpetual and its counsel. The Borrower shall have good and marketable title to the Shares free of any claims and shall deliver an opinion of counsel to that effect.
 Plt.App. at A47-48.
 
 
 [12]
 Pursuant to Fed.R.App.P. 10(e), we grant the trustees' motion to make the commitment letter a part of the appeal. We do so because it is material, but without prejudice to the objections the stockholders raise to its admission, which can be more properly considered by the district court