Joseph L. CASTLE, II, Alan M. Feldman, Miguel A. Mora and Robert S. Seltzer, Trustees of the Psychiatric Hospitals of America, Inc., Employee Stock Ownership Plan, and Retirement Plan Committee of the Psychiatric Hospitals of America, Inc., Employee Stock Ownership Plan, and Psychiatric Hospitals of America, Inc.

v.

Robert M. COHEN, Hartsell, Inc., Cheyenne Corporation, and Roland M. Jermyn.

Civ. A. No. 87–1402.

United States District Court, E.D. Pennsylvania.

Dec. 7, 1987.

13. I note for the record that I dispute the sub- stance of Mr. Wax's alleged statements.

Marc Durant, Robert M. Wolff, Karen S. Berger, Marc Durant & Associates, Philadelphia, Pa., William P. Frank, Jay S. Berke Skadden, Arps, Slate, Meagher & Flom, New York City, for trustees.

Harold E. Kohn, Robert A. Swift, Marguerite R. Goodman, Denis F. Sheils, Kohn, Savett, Klein & Graf, Philadelphia, Pa., for Cohen, Hartsell, and Cheyenne.

Gregory T. Magarity, James G. Wiles, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for Jermyn.

James J. Binns, Philadelphia, Pa., for Psychiatric Hosp.

J. Clayton Undercolfer, III, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for counterclaim defendants Castle, Feldman, Mora and Seltzer, individually and as escrow agents.

## MEMORANDUM OPINION

CAHN, District Judge.

This litigation involves complex issues related to the Employee Stock Option Plan ("ESOP") of Psychiatric Hospitals of America ("PHA").

### I. *Facts*

On December 4, 1984, Robert M. Cohen pleaded guilty to Medicare fraud before the Honorable J. William Ditter, Jr. of this court. Because Cohen owned more than five percent of the stock in PHA, PHA would no longer be entitled to Medicare reimbursements after the imposition of sentence which was scheduled for February 1, 1985.[1] In order to ensure that PHA would continue to receive Medicare funds, Cohen and certain other stockholders (the "Cohen Group") transferred 56.2% of the outstanding shares in PHA to the trustees of the ESOP. The parties agree that the trustees of the ESOP are independent persons not controlled directly or indirectly by Cohen.

At the time the Cohen Group transferred the stock to the ESOP trustees acting as escrow agents, the Cohen Group and the trustees entered into a stock purchase agreement dated January 31, 1985. This agreement provides that the price the trustees are to pay to the Cohen Group for the 56.2% interest in PHA would be fair market value as determined through an appraisal process. The function of the ap-

---

1. *See* 42 C.F.R. § 489.12 (authorizing Health Care Financing Administration to refuse to enter into or renew an agreement to provide ser- vices to Medicare beneficiaries if "[p]rincipals of the provider have been convicted of fraud").

praisal process was to determine the fair market value of the 56.2% majority block of stock as of January 31, 1985.

The trustees were to begin the appraisal process by submitting an independent appraisal to the Cohen Group. If the Cohen Group was not satisfied with the value set by that appraisal, the Cohen Group could procure a second appraisal. If the value set by the second appraisal exceeded the value set by the first by more than 10 percent, then the ESOP trustees could, at their option, purchase the shares at the price determined by the Cohen Group's appraisal. Finally, if the trustees declined to purchase at that price, the Cohen Group could seek a third-party purchaser with the trustees retaining a right of first refusal.

The following events transpired with respect to the stock purchase agreement:

(a) The trustees obtained an appraisal from Marshall & Stevens setting the value for the 56.2% majority block of stock as of January 31, 1985, at $13,072,232;

(b) The Cohen Group obtained an appraisal from Poole and Associates setting the value of the 56.2% majority block of stock as of January 31, 1985, at $38,790,-000;

(c) The Cohen Group entered into a purchase agreement dated February 27, 1987, wherein the 56.2% majority interest was to be sold to the Ramsay Hospital Corporation of Pennsylvania at a price of $28,015,000; [2]

(d) The ESOP trustees filed this suit against the Cohen Group seeking to enforce the trustees' rights under the stock purchase agreement.

## II. *Procedural History*

The claims of the trustees are based upon the Employee Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. §§ 1001–1461 (1982 & Supp. I 1983 & Supp. II 1984 & Supp. III 1985), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), common law fraud and breach of contract. The defendants filed counterclaims including claims based upon the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1982 & Supp. III 1985 & Supp. IV 1986), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982) and various common law causes of action.

The parties are interested in a prompt disposition of the controversy. A number of minority shareholders have filed suits assigned to my docket based upon allegations of securities fraud, RICO, and common law causes of action.

After extensive pretrial conferences and pretrial motion practice, I submitted three issues concerning the basic contract dispute to a jury. These issues were set forth in written interrogatories.[3] For the reasons that follow, the interrogatories were structured sequentially. If the trustees fail to prove that the Poole appraisal was

---

**2.** The January 31, 1985, agreement also provides that if, during the time allotted to the Cohen Group to procure an appraisal, a third party offers to purchase the shares for an amount that exceeds the value set by the first appraisal by more than 10 percent, the Cohen Group could require the trustees to meet the amount of the third-party offer and if the trustees did not, then the Cohen Group could sell to the third party. The offer received from the Ramsay Group failed to trigger this provision because it was not conveyed during the appraisal period as defined by the January 31, 1985, agreement.

**3.** The interrogatories were framed as follows:

1. Have the plaintiffs (Joseph L. Castle, II, Alan M. Feldman, Miguel A. Mora and Robert S. Seltzer) proved by a preponderance of the evidence that the Poole Appraisal was not submitted in conformity with the requirements and standards of the January 31, 1985 Stock Sale Agreement?

( ___ ) ( ___ )
YES NO

If your answer is "no", return to the Courtroom. (If your answer is "yes", proceed to #2).

2. Have the plaintiffs proved by a preponderance of the evidence that the Marshall & Stevens Appraisal was submitted in conformity with the requirements and standards of the January 31, 1985 Stock Sale Agreement?

( ___ ) ( ___ )
YES NO

If your answer is "yes", return to the Courtroom. (If your answer is "no", proceed to #3).

3. What was the fair market value of the 56.2% block of stock in PHA on January 31, 1985?

$ _____

invalid, then their claim is defeated because they declined the opportunity to purchase the stock at the price set by that appraisal. However, if the trustees were able to prove that the Poole appraisal was invalid and that the Marshall & Stevens appraisal was valid, then they would be entitled to a decree enforcing the terms of the contract. The Cohen Group, in effect, would have declined the opportunity to submit a valid appraisal and the trustees would have the right to purchase the stock at the price set by the Marshall & Stevens appraisal. Only if both the Poole appraisal and the Marshall & Stevens appraisal were invalid would it be necessary for the jury to determine the fair market value of the stock as of January 31, 1985, in order to enforce the terms of the contract as contemplated by the parties.

After three weeks of testimony and several days of deliberation, the jury answered "Yes" to interrogatory number 1, "No" to interrogatory number 2, and determined the fair market value of the 56.2% majority interest as of January 31, 1985, to be $15,-800,000.

After the jury verdict and after extensive discussion on the record with the lawyers, I entered a final order which declared the Poole appraisal to be invalid, declared the Marshall & Stevens appraisal to be invalid, and set the fair market value of the Cohen Group's stock as of January 31, 1985, at $15,800,000. In addition, the final order dismissed all of the other claims with prejudice. A copy of this order is attached to this Memorandum Opinion as Addendum "A".

The defendants appealed from this order and filed a motion before the United States Court of Appeals for the Third Circuit seeking injunctive relief pending the outcome of the appeal. Following a hearing before an emergency panel of the Court of Appeals, at which defendants' motion was denied, the defendants made an application for similar relief in this court in the form of a Motion to Alter, Amend or Grant Relief

from Judgment. In addition to repeating arguments previously rejected, the motion requested that I permit the Cohen Group to sell their stock to the Ramsay Group unless the plaintiffs tendered payment by October 10, 1987. I held hearings on this motion on October 9 and October 21, 1987, during which counsel set forth their respective positions.

The trustees argued that they should not effectively be denied the benefits of the judgment and the jury verdict and that they were entitled to a reasonable time period within which to exercise their rights under the contract. They suggested that it would be reasonable to expect them to secure the necessary financing within three to four months after the appeal process was completed. The defendants argued that if the Ramsay offer were allowed to lapse they might be irreparably injured and therefore asked this court to set a date after which, if the trustees have not tendered payment, they can sell their shares to a third party. The defendants suggested that it would be reasonable to require the trustees to tender payment by November 6, 1987, or at the latest, sometime in December, 1987.

The concerns of both parties were well taken. I therefore entered a final order on October 26, 1987, modifying my earlier order and setting a date certain of March 31, 1988, after which, if the trustees have not consummated the purchase of the 56.2% majority block of stock, the Cohen Group may sell their stock to a third party. For the protection of the beneficiaries of the ESOP, my October 26, 1987, order contained two additional requirements: first, that any sale to a third party be for an amount greater than $15,800,000 plus applicable interest from January 31, 1985, and second, that from the proceeds of any sale to a third party, $15,800,000 plus applicable interest from January 31, 1985, be put in escrow pending a final resolution of this case.[4] A copy of this order is attached to

---

**4.** An escrow provision was necessary for several reasons. It was the intent of the parties that any amount secured from a third party purchaser over the fair market value of the stock as of January 31, 1985, inure to the benefit of the ESOP. *See* Contract at ¶ 6(e). If the third party purchaser were the Ramsay Group, this amount would be approximately $8,000,000.

this Memorandum Opinion as Addendum "B".

Ordinarily, extensive post-trial motion practice would have occurred in litigation of this type. However, the Cohen Group is concerned that the Ramsay Hospital Corporation of Pennsylvania will withdraw its offer to purchase in the near future. Therefore, I felt it advisable to enter a final order promptly. This Memorandum Opinion is filed for the purposes of explaining my reasoning in regard to the legal and equitable issues in this case.

### III. *Jurisdiction*

Diversity of citizenship between the plaintiffs and the defendants in this case is not complete. Jurisdiction is proper, however, based upon this court's jurisdiction over federal questions, 28 U.S.C. § 1331 (1982), as well as upon Section 502 of ERISA, 29 U.S.C. § 1132(e) (1982). The trustees' complaint contained allegations of violations of the federal securities laws and ERISA requirements. Although the issues submitted to the jury are related to state law rather than ERISA, the ERISA allegations provided the court with subject matter jurisdiction over the entire controversy.

■ A federal court may exercise pendent jurisdiction over related state law claims "when the state and federal claims derive from a common nucleus of operative fact such that a plaintiff would ordinarily be expected to try them all in one judicial proceeding, and when the federal claims have sufficient substance as to confer subject matter jurisdiction on the court." *Amalgamated Cotton Garment & Allied Indus. Fund v. J.B.C. Company of Madera,* 608 F.Supp. 158, 167 (W.D.Pa.1984) (ERISA claim and claim under § 301 of LMRA support pendent jurisdiction) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). In the present case, it is clear that the state and federal claims "derive from a common nucleus of operative fact" in that the plaintiffs' ERISA claim as well as their state law claims arise out of the same transaction—the sale of the 56.2% majority block of stock by the Cohen Group to the ESOP.

It is also clear that the plaintiffs' federal claim has sufficient substance to confer subject matter jurisdiction on this court. A claim is insubstantial only if prior decisions render it frivolous. *Hagans v. Lavine,* 415 U.S. 528, 537–39, 94 S.Ct. 1372, 1379–80, 39 L.Ed.2d 577 (1974). Despite the fact that I dismissed, after trial, all of the federal claims, plaintiffs' federal claims were non-frivolous and sufficiently substantial to confer subject matter jurisdiction on this court. *See Kerry Coal Co. v. United Mine Workers,* 637 F.2d 957, 965 (3d Cir.), *cert. denied,* 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981); *Amalgamated Cotton,* 608 F.Supp. at 167; *Mitchell v. Hendricks,* 68 F.R.D. 569, 571 (E.D.Pa.1975); *see also Walsh v. Great Atl. & Pac. Tea Co.,* 96 F.R.D. 632, 638 (D.N.J.) (ERISA claim supports pendent jurisdiction over claims based on breach of contract, detrimental reliance and wrongful seizure), *aff'd,* 726 F.2d 956 (3d Cir.1983). I exercised my discretion to adjudicate the state law claims in this case because a resolution of this matter will be of substantial assistance in resolving several related minority stockholder suits pending on my docket.

### IV. *A Jury Trial Was Appropriate*

■ The defendants objected to a jury trial for two reasons. First, they contend-

---

The trustees, however, may be entitled to an even greater amount. If the defendants sell their stock to a third party purchaser because the trustees are unable to tender payment by March 31, 1988, the Court of Appeals might subsequently find that the March 31, 1988, date was unreasonably short and that the trustees deserved the benefit of their bargain. Under this scenario, the trustees would be entitled to the fair market value of the stock as of the date of Court of Appeals' decision less $15,800,000 plus interest. If the fair market value of the stock as of the date of the Court of Appeals'

decision is, for example, $40,000,000, the trustees would be entitled to nearly $20,000,000. For this reason, I set the amount to be escrowed at $15,800,000 plus interest from January 31, 1985, instead of setting it at the third party purchase price, less the sum of $15,800,000 plus interest from January 31, 1985. The manner in which I structured the escrow provision has the additional advantage of giving the defendants a short term incentive, which otherwise would not exist, to sell the stock for the highest possible price.

ed that there were no factual issues and that summary judgment was appropriate because the trustees lacked "clean hands." Second, to the extent there were any factual issues, the defendants argued that those issues should be decided without a jury because the case was essentially a proceeding in equity. In my view, the controversy over whether the Poole appraisal and the Marshall & Stevens appraisal met the contractual requirements of the stock purchase agreement was factual in nature and well suited to trial by jury. To the extent that the decision should be made by a judge sitting without a jury, I adopt the findings of the jury as those of the court.

## V. *Plaintiffs' Claim For Breach of Contract And Specific Performance*

The central issues in this case concern the trustees' cause of action based on breach of contract and their request for specific performance. The Cohen Group has defended by making essentially two arguments, one legal and one equitable. The first thrust the defendants make is that the jury's answer to the second interrogatory—that is, that the Marshall & Stevens appraisal was not submitted in accordance with the terms of the stock purchase agreement—is tantamount to a finding that the plaintiffs breached the stock purchase agreement. The defendants argue that this alleged breach is material and renders the agreement unenforceable, thereby giving them the opportunity to sell to a third party—namely the Ramsay Group. Second, the defendants urge that there is uncontradicted evidence that the plaintiffs

sought a low appraisal in order to disadvantage the defendants and therefore came into court with unclean hands.[5] They contend that the appraisal is tainted in a manner which prevents the plaintiffs from securing equitable relief. In the order of this court dated September 28, 1987, I rejected both of these contentions.

### A. Defendants' Legal Defenses

In construing a contract, the intent of the parties is of paramount importance. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980); *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 483 F.Supp. 1185, 1196 (E.D.Pa.), *aff'd*, 637 F.2d 205 (3d Cir.1980). The parties intended that the Cohen Group would sell and the trustees would buy for fair market value the 56.2% majority interest in PHA. All that was left open was the actual price.[6] In order to effectuate the parties' intentions, the contract should be construed to permit the trustees to purchase the defendants' shares at the valuation price set by the jury.

Furthermore, the parties intended that the beneficiaries of the trust were entitled to any increase in value of PHA after January 31, 1985. *See* Contract at ¶ 6(e). Therefore, if the trustees cannot complete the purchase, any overage secured by the Cohen Group from the $15,800,000 figure, plus interest from January 31, 1985, should accrue to the benefit of the ESOP. It was to ensure that any overage would accrue to the benefit of the ESOP that I denominated the $15,800,000 figure, under the terms of the stock purchase agreement, as the

---

**5.** The equitable doctrine of unclean hands is a companion principle to the common law doctrine of *in pari delicto. See Tarasi v. Pittsburgh Nat'l Bank*, 555 F.2d 1152, 1156 n. 9 (3d Cir.), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977). The maxim, as traditionally espoused, is "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945); *Research Corp. v. Gourmet's Delight Mushroom Co.*, 560 F.Supp. 811, 819 (E.D. Pa.1983).

**6.** Although not directly applicable, it is significant that the Uniform Commercial Code provides that a contract may be enforced even if

the price is not settled, if the parties so intend. U.C.C. § 2–305(a); 13 Pa.Cons.Stat.Ann. § 2305(a) (Purdon 1984). In the present case, it is clear that the parties intended to enter into a binding agreement and equally clear that they intended to leave the price term open. The fact that the process for setting the price term miscarried does not constitute a material breach of the contract. Indeed, § 2–305(a) further provides that if "the price is to be fixed in terms of some ... standard as set ... by a third person ... and it is not so set" the price shall be a "reasonable price." Here, the parties intended that a reasonable price would be the fair market value of the stock on January 31, 1985.

"Stockholder's Value" in the September 23, 1987, order.

 In effect, the defendants are asking this court to rescind the contract between themselves and the ESOP. Rescission, an equitable rather than a legal remedy, is appropriate only under extraordinary circumstances when the complaining party has suffered a breach of such a fundamental and material nature that it affects the very essence of the contract and serves to defeat the object of the parties. *See Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1186 (2d Cir.1975); *Terkel v. Hearth Rooms, Inc.*, 410 F.Supp. 1160, 1162 (W.D.Pa.1976); 12 *Williston on Contracts* § 1455 (W. Jaeger 3d ed. 1970). The process for determining price that was chosen by the parties was not at the very heart of the contract between them. Rather, the essence of their agreement was that the stock would change hands at fair market value. All that is required of this court is, with the aid of the jury, to set the "fair market value." [7] Having determined market value of the stock as of January 31, 1985 to be $15,800,-000, the contract between the parties is enforceable in every respect.

### B. Defendants' Equitable Defenses

 The clean hands doctrine is applicable when 1) a party seeking affirmative relief 2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith 3) directly related to the matter in issue 4) that injures the other party 5) and affects the balance of equities between the litigants. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814–15, 65 S.Ct. 993, 997–98, 89 L.Ed. 1381 (1945) (clean hands doctrine requires that suitors "shall have acted fairly and without fraud or deceit as to the controversy in issue"); *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 855 (3d Cir.1984), (unclean hands defense applies when plaintiff's conduct is "inequitable," "egregious," and "involves the subject matter of the plaintiff's claim"), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985); *International Union, Allied Industrial Workers v. Local 589*, 693 F.2d 666, 672 (7th Cir.1982) ("bad conduct constituting unclean hands must involve fraud, unconscionability or bad faith toward the party proceeded against" which "'affect[s] the equitable relations between the litigants'" and doctrine "only applies when there is a direct nexus between the bad conduct and the activities sought to be enjoined") (quoting *Washington Capitols Basketball Club v. Barry*, 419 F.2d 472, 478 (9th Cir.1969)); *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir.1979) ("alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct"), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980); *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 195 (8th Cir.1976) (application of unclean hands doctrine is an "extreme sanction ... [which] requires a [substantial] showing of fault, willfullness or bad faith"), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977); *John Wright, Inc. v. Caspar Corp.*, 419 F.Supp. 292, 324 (E.D.Pa.1976) ("The courts of Pennsylvania interpret [the defense of unclean hands] narrowly and are loathe to bar relief except where the plaintiff's conduct is clearly on point and 'change[s] the equitable relationship of the parties.'") (quoting *Goebel Brewing Co. v. Esslingers, Inc.*,

---

7. It is clear that if the parties had contracted for the sale of stock at fair market value, without providing for a process to determine fair market value, the contract would be sufficiently specific to be enforceable. *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 124 (3d Cir.1986) (contract enforceable even if price term left open if parties had intended to conclude a contract) (finding U.C.C. persuasive). The jury found that the parties had partially breached the contract with respect to the pro-

cess for determining fair market value. Not only are these breaches not material but if the process for determining fair market value, having been breached, is read out of the contract, the contract is capable of standing independently. Indeed, absent the provisions for determining value, the case should be treated no differently than if they had never been added. The intent of the parties being clearly evident, it is proper for the court to enforce the contract by determining fair market value.

373 Pa. 334, 349, 95 A.2d 523 (1953)), *aff'd in part and rev'd in part sub nom., Donsco, Inc. v. Caspar Corp.,* 587 F.2d 602 (3d Cir.1978).

■ Although the first and third elements have been satisfied in this case, defendants have failed to establish the second, fourth and fifth elements. The defendants are precluded, therefore, from raising the doctrine of unclean hands as a defense to plaintiffs' action. During a trial that lasted nearly three weeks, an insufficient amount of evidence surfaced to support a finding of fraud, deceit or bad intent on the part of the trustees. In addition, the trustees' submission of an improper appraisal did not injure the defendants who, under the stock purchase agreement, had a right to correct any injury that might otherwise have occurred by submitting a valid appraisal.

Furthermore, the submission of an improper appraisal by the trustees did not change the balance of equities between the parties. A defendant wishing to interpose the defense of unclean hands must show that "the plaintiffs' fault is substantially equal to that of the defendant." *Tarasi v. Pittsburgh Nat'l Bank,* 555 F.2d 1152, 1157 (3d Cir.) (explaining "companion principle" of *in pari delicto* ), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977); *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 76 (2d Cir.1980) (Friendly, J.) (defense of unclean hands requires "equal guilt" under New York law), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). Using the jury's finding of fair market value as a rough measure of the respective parties' "guilt", the trustees' appraisal inaccurately measured fair market value by 2.7 million dollars, reflecting in great part certain good faith miscalculations conceded at trial. The defendants' appraisal, on the other hand, was "invalid" to the tune of nearly $23,000,000. If there was "fault" on behalf of the parties, it certainly was not equal.

■ Application of the defense of unclean hands, moreover, rests in the discretion of the court, and in exercising that discretion the public interest is of vital significance. *See Precision Co.,* 324 U.S. at 815, 65 S.Ct. at 997–98. When acting in equity, a court should never lose sight of public policy as enunciated by Congress. *See Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 2628, 86 L.Ed.2d 215 (1985) ("the classic formulation of the *in pari delicto* doctrine itself required a careful consideration of such [public policy] implications before allowing the defense"); *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 138, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968) (public policy underlying Sherman and Clayton Acts), *overruled on other grounds, Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 179–80, 94 S.Ct. 414, 423, 38 L.Ed.2d 388 (1973) (" 'courts of equity may, and frequently do, go much farther to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.' ") (quoting *Virginian Ry. Co. v. System Federation 40, Ry. Employees,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937)) (policy behind NLRA). In enacting ERISA, Congress was greatly concerned about the pension rights due to workers for long years of service with their employer. *See* 29 U.S.C. § 1001(a) (1982). The trustees want to purchase a majority interest in PHA in order to benefit the employees.[8] To punish the employees for any wrongdoing of the trustees would violate congressional policy and I decline the defendants' invitation in that respect.[9]

---

**8.** In the previous section, I determined that the contract between the parties is enforceable as written. However, reading the contract in order to carry out as nearly as possible the intent of the parties—that is, that the employees would receive the benefits of the stock purchase—is analogous to employing the doctrine of *cy pres* in the area of charitable and private trusts. *See Scott on Trusts* § 399 (3d ed. 1967); 20 Pa.Cons. Stat.Ann. § 6110 (West Supp.1987).

**9.** *See Donovan v. Schmoutey,* 592 F.Supp. 1361, 1403 (D.Nev.1984) (unclean hands defense unavailable in enforcement suit brought under

■ The defendants have made the additional thrust that the trustees are not entitled to specific enforcement because the trustees never tendered the 13.2 million dollars at which Marshall & Stevens valued the stock, or in the alternative, because the trustees have never shown that they are ready, willing and able to tender that amount.

■ It is not necessary for a claimant to produce money or otherwise actually perform. *Restatement (Second) of Contracts* § 238 comment b (1979).[10] Rather, the plaintiff must be ready and able to perform, and must give notice of his or her readiness to the other party. *Williston on Contracts* § 833 (W. Jaeger 3d ed. 1972); *Monroe St. Properties, Inc. v. Carpenter*, 407 F.2d 379, 380 (9th Cir.1969). The plaintiff trustees have made clear by their words and actions that they are ready, willing and able to perform their obligations under the contract and to seek financing in order to consummate the stock sale as soon as possible. *See, e.g.,* Affidavit of Joseph L. Castle, II in Opposition to Defendants' Joint Motion to Dismiss at 9–10; Letter from Charles F. Clement, 3d to the ESOP Trustees (April 20, 1987) ("highly confident" letter from Prudential Bache), attached as Exhibit A to Affidavit of Joseph L. Castle, II, *supra;* Testimony of Alexander Hoinsky, transcript of October 9, 1987 hearing at 3.

Moreover, although it may be necessary in an action for damages to require tender in order to protect the defendant, in equity such protection may be afforded the defendant through the proper fashioning of a decree. *See Restatement (Second) of Contracts* § 363 (1979); *Williston on Contracts* § 834 W. Jaeger 3d ed. (1972). Defendants' fear that they might perform without receiving the agreed-upon exchange, therefore, is unfounded. The or-

der I filed in this case conditions any performance required of the defendants on tender by the trustees. Furthermore, if the trustees fail to tender the consideration by March 31, 1988, the Cohen Group may sell to a third party.

The defendants knew at the time they entered into the stock sale agreement that they were selling stock to a leveraged ESOP that would need financing in order to consummate the purchase of stock. It ill-behooves the defendants to claim that the trustees cannot bring an action for breach of contract and specific performance because they have not tendered the purchase price, when it is the actions of the defendants that are clouding the trustees' title to the shares and hindering the trustees' efforts to finance the sale.

Finally, the defendants have argued that the plaintiffs are not entitled to specific performance because they have an adequate remedy at law. The trustees, however, claim that damages would not adequately compensate the ESOP for the loss of the 56.2% majority block of stock. *See* C. Wright & A. Miller, *Federal Practice and Procedure* § 2944 (1973). In the preliminary injunction context, the Court of Appeals has held that irreparable harm would result in two situations: "(1) where the subject matter of the contract is of such a special nature or peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is impossible to ascertain the legal measure of loss so that money damages are impracticable." *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226, 227 (3d Cir.1987) (noting also that the "requirements for the grant of a preliminary injunction are more stringent than those for specific performance").

In the present case, both situations are present. The stock at issue is unique in

---

ERISA "because its application would significantly harm" innocent parties, namely participants and beneficiaries). To the extent the defendants wish to continue their claims that the trustees acted improperly, a possible remedy would be to seek to remove the trustees. This court, of course, takes no position in regard to whether such an action would be successful.

**10.** In any case, it is clear that actual tender of 13.2 million dollars plus interest, when the Cohen Group is demanding 28 or 38 million dollars, would be futile. A court sitting in equity will not require a party to perform a useless act. *Williams v. Barbaretta*, 359 Pa. 488, 494, 59 A.2d 161 (1948).

## 630

that it (1) is a majority block of stock, (2) in a closely-held corporation, and (3) represents an opportunity for the employees to own their own business. The parties themselves recognized that the stock was "unique and not otherwise available and that the remedy at law for any breach of [the] agreement shall be inadequate." *See* Contract at ¶ 14. In addition, money damages would be an impractical remedy because measuring the ESOP's legal loss would require that the court determine the fair market value as of the date of judgment of a corporation whose stock is not publicly traded. *See King v. Stevenson,* 445 F.2d 565, 572 (7th Cir.1971) (control block of stock of publicly traded company sufficiently unique to warrant specific performance); *United Acquisition Corp. v. Banque Paribas,* 631 F.Supp. 797, 805 (S.D.N.Y.1985) (control block of stock in private corporation subject to specific performance); *Sherman v. Herr,* 220 Pa. 420, 423, 69 A. 899, 900 (1908) (same).

### VI. *Dismissal of Defendants' RICO Claim*

■ Defendants' RICO counterclaim was dismissed on August 14, 1987, before the jury trial commenced. It was proper to dismiss this counterclaim because it was not adequately pleaded. To state a claim for damages under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1982 & Supp. III 1985 & Supp. IV 1986), a party must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering. 18 U.S.C. § 1962; *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Defendants have failed to allege a "pattern" of racketeering activities and their counterclaim was therefore dismissed.

In *Sedima,* the Court emphasized that a pattern " '*requires* at least two acts of racketeering activity' § 1961(5), not that it 'means' two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.' " *Id.* at 496 n. 14, 105 S.Ct. at 3285 n. 14 (Supreme Court's em-

phasis). The Court cited legislative history to the effect that " '[t]he infiltration of legitimate business normally requires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern.' " *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting S.Rep. No. 91–617, p. 158 (1969)) (Supreme Court's emphasis). This factor of continuity plus relationship is the touchstone of an inquiry into whether the existence of a "pattern" of racketeering activity has been sufficiently alleged. It is clear that the acts alleged by the defendant as the basis for their RICO claim are "related." They are related, however, to such an extent that they fail to establish any "threat of continuing activity."

In *Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mutual Ins. Co.,* 641 F.Supp. 297, 311–12 (E.D.Pa.1986), I adopted the reasoning of the eighth circuit in *Superior Oil Co. v. Fulmer,* 785 F.2d 252 (8th Cir.1986) in requiring multiple schemes before a pattern of racketeering activities could be found. The Court of Appeals for the Third Circuit for some time neither adopted or rejected this approach. *See Town of Kearny v. Hudson Meadows Urban Renewal Corp.,* 829 F.2d 1263 (3d Cir.1987); *Petro–Tech v. Western Co. of North America,* 824 F.2d 1349 (3d Cir. 1987). In *Barticheck v. Fidelity Union Bank/First National State,* 832 F.2d 36 (3d Cir.1987), however, the Court of Appeals held that under certain circumstances a single scheme could constitute a pattern of racketeering activity.

The rationale for requiring multiple schemes derived from the statutory language of 18 U.S.C. § 3575(e) which states that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes [ (plural) ]...." The multiple scheme requirement, therefore, stemmed from the recognition that in enacting RICO Congress intended to reach separate criminal acts or series of acts that each have the same or a similar *type* of purpose, and not acts that have only one and exactly the same purpose (singular).

It is for this reason that factors such as the number of victims, number of perpetrators and number of predicate acts are relevant determinants of the existence of a pattern of racketeering activity. *See Barticheck,* 832 F.2d at 38–39; *Petro–Tech,* 824 F.2d at 1355. Viewed in this manner, the facts alleged in *Barticheck* are clearly sufficient to constitute a pattern. The Bank in that case allegedly committed fraudulent acts with similar purposes, although in furtherance of one grand design, against twenty-three different victims. The Court in *Barticheck* nonetheless eschewed the multiple scheme terminology. I am persuaded, however, that under any test, the conduct alleged in this case does not rise to the level of a "pattern" of racketeering activity as contemplated by Congress.

At best, defendants have alleged only one fraudulent transaction surrounding the Stock Sale Agreement at issue in this case. The acts involved in this transaction are not of a continuous nature, but rather are discrete and well-bounded. Moreover, there were no allegations of past or present criminal conduct or allegations that the plaintiffs' alleged criminal activities were otherwise of a continuous nature. Plaintiffs' activity, if it was criminal, was not episodic but singular. Moreover, *Barticheck* is distinguishable from the present case on the basis of the number of victims involved.

The defendants artificially divide the negotiation and implementation of the Stock Sale Agreement into five segments they denominate "schemes." The first "scheme" alleges that the trustees fraudulently induced the defendants to enter into the Stock Sale Agreement by making certain promises. The complaint does not allege that these promises were not kept, nor does it specify with particularity those acts of the trustees that are allegedly fraudulent. In essence, the first "scheme" alleges that the trustees and the defendants negotiated and executed a contract for consideration and that the interstate mails and wires were used to relay drafts and revisions.

The second "scheme" alleges that the trustees caused the appraisal submitted by Marshall & Stevens to be fraudulently prepared. Again no particular fraudulent acts are specified. Moreover, no evidence surfaced at trial which would have supported a finding of fraud.

The third "scheme" alleges that the trustees fraudulently dissuaded third parties from considering the acquisition of PHA. The defendants fail to plead, however, the perpetration of any act of fraud against a third party. Rather, the defendants claim that the trustees wrote a bad check, allowed certain bonds to go into default, and depleted corporate assets, and that the result of these activities was to dissuade third parties from considering the acquisition of PHA. The defendants have adequately pleaded causes of action for breach of fiduciary duties, but not for mail and wire fraud.

The fourth "scheme" alleges extortion by one of the trustees, Alan M. Feldman, in attempting to dissuade the Ramsay group from entering into a sale agreement with the defendants. This is perhaps the most significant allegation of a predicate act.[11] The Ramsay Group, however, continued to be interested in the acquisition of PHA and actively pursued its rights under the sale agreement with the Cohen Group. Moreover, this singular act, even if properly pleaded, does not raise the transaction as a whole to the level of a "pattern" of racketeering activity.

The final "scheme" alleges corporate waste, self-dealing and embezzlement of pension funds. Defendants failed to particularize their allegations, and again, no evi-

---

11. Even so, defendants have failed sufficiently to allege extortion under either the Hobbs Act, 18 U.S.C. § 1951 (1984) or Pennsylvania law, 18 Pa.Cons.Stat. § 3923 (Purdon 1983). Defendants have failed to allege that the trustees affected, delayed, or obstructed interstate commerce, or that they actually obtained or withheld the property allegedly extorted. *See Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960) (defining elements of a Hobbs Act crime); *United States v. Local 560, Int'l Brotherhood of Teamsters,* 780 F.2d 267, 281 (3d Cir.1985) (same), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986).

dence surfaced at trial which would have supported them.

Relying on the decision in *Petro-Tech, supra,* the defendants argue that their RICO claim is adequately pleaded in part because it alleges the existence of multiple victims. In reality, the transaction which the defendants complain of has at most one victim—the defendants. The possibility that other individuals may have been indirectly injured as a result of plaintiffs' alleged criminal activity—such as the Ramsay Group's alleged injury as a result of corporate mismanagement—is too tenuous to be of any consequence. In any case, there are certainly fewer victims than the twenty-two alleged in *Barticheck* and the twenty in *Petro-Tech.*

While the plaintiff in *Town of Kearny* alleged only two victims (excluding the possibility that all of the citizens in the town were victims), there were two separate transactions involved. A pattern is more likely to arise, if there are few victims, when there are several transactions. Moreover, to the extent that there is more than one victim in this case, the predicate acts and purposes associated with these victims are not sufficiently similar to create a pattern. In either case, the defendants have failed to allege a pattern of racketeering activity.

In effect, defendants have alleged that the trustees have carried on normal corporate operations, but in describing these operations they have inserted "fraudulently" before each verb. Not only do defendants fail to allege a "pattern of racketeering activity", but they also fail to allege fraud with the level of particularity required by Fed.R.Civ.P. 9(b). *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); *Bull v. American Bank and Trust Co.,* 641 F.Supp. 62 (E.D.Pa.1986).

 More specifically, defendants' conspiracy claim under § 1962(d) must be dismissed because they have failed to "assert that each defendant so charged has 'by his words or actions ... objectively mani-fested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes.'" *Eaby v. Richmond* 561 F.Supp. 131, 137 (E.D.Pa.1983) (quoting *United States v. Boffa,* 688 F.2d 919, 937 (3d Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983)) (emphasis omitted). Furthermore, a civil RICO conspiracy must be pleaded "'with enough specificity to inform multiple defendants of the facts forming the basis of the conspiracy charge. Such allegations must delineate among the defendants as to their participation or responsibilities in making the statements which are the subject of the suit. Conspiracies described in sweeping or general terms cannot serve as the basis for a cause of action and may be dismissed.'" *Id.* at 137 (quoting *Van Schaick v. Church of Scientology, Inc.,* 535 F.Supp. 1125, 1141 (D.Mass.1982)). Defendants have not pleaded their conspiracy claim with the requisite specificity and it must be dismissed.

Finally, this case is in a different posture than cases in which all claims are dismissed at the Rule 12 stage. This court has had the benefit of a three week trial during which there was a complete factual development of all of the issues in the case. After unravelling this set of facts, it is eminently clear that there is little or no evidence of intent with respect to the allegedly fraudulent acts of the trustees. *Carpenter v. United States,* — U.S. —, —, 108 S.Ct. 316, 321–22, 98 L.Ed.2d 275 (1987) (mail fraud requires specific intent to defraud); *United States v. Perlstein,* 576 F.2d 531, 537 (3d Cir.1978) (same). In addition, it was in the defendants' interest to produce all available evidence of the plaintiffs' bad intent in their attempt to show that the plaintiffs' appraisal was tainted. In light of the fact that fraud must be proved by clear and convincing evidence, *Moffatt Enters., Inc. v. Borden Inc.,* 807 F.2d 1169, 1174–75 (3d Cir. 1986), it is beyond peradventure that defendants would fail to sustain their burden in establishing the predicate fraudulent

acts.[12]

## VII. *Dismissal of All Remaining Claims*

 It was also proper to dismiss defendants' counterclaims based upon fraud. After a lengthy trial in which evidence was admitted pertaining to any attempts the plaintiffs may have made improperly to influence the Marshall & Stevens appraisal, it is clear that the evidence adduced was insufficient to establish the existence of fraud.

Notes from meetings attended by the trustees to the effect that it would be advantageous to secure a low appraisal were introduced at trial. Defendants rely on these notes for their fraud claim. This evidence, however, falls far short of establishing a willful intent to deceive, especially in this factual context. *See Timco Eng'g, Inc. v. Rex & Co.*, 603 F.Supp. 925, 930 (E.D.Pa.1985) (cause of action for fraud includes element of intent); *Thomas v. Seaman*, 451 Pa. 347, 350–51, 304 A.2d 134, 137 (1973) (same). There was no evidence of any unethical conduct by the employees of the firm of Marshall & Stevens. Nor was there any evidence that the plaintiffs exerted any improper influence on Marshall & Stevens to reach a particular valuation. There was some evidence that the accounting data submitted to Marshall & Stevens may not have accurately reflected the financial condition of PHA. However, the financial data which the plaintiffs caused to be submitted to their appraiser was substantiated by plaintiffs' witnesses at the trial and there was no evidence that the submission of this data was tainted by any fraudulent conduct.

Scienter is a necessary element in a cause of action alleging violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982). *See Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *Ernst and Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Defendants claims under § 10(b) and Rule 10b–5, therefore, also fail for lack of supportive evidence.

Defendants are precluded from bringing their claims for breach of fiduciary duties, corporate mismanagement and waste of corporate assets under ERISA. *See* 29 U.S.C. § 1132 (1976 & Supp. V 1981) (providing for suits by participants, beneficiaries, fiduciaries and the Secretary of Labor). These claims, therefore, are based entirely on state law, and if this court has jurisdiction over them, it is through this court's ancillary jurisdiction. The claims arise from the same nucleus of operative facts as the federal claims in this case. However, ancillary jurisdiction, like pendent jurisdiction, is a doctrine of discretion. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Shaffer v. Board of School Directors of the Albert Gallatin Area School Dist.,* 730 F.2d 910, 912 n. 1 (3d Cir.1984); *Hernandez v. Whitesell,* 462 F.Supp. 569, 574 (E.D.Pa.1978).

 I declined to exercise ancillary jurisdiction over defendants' claims for breach of fiduciary duty, waste and corporate mismanagement for the following reasons.[13] First, these claims are peculiarly state law claims and should, as a matter of comity, be remitted to the state courts. *Hagans v. Lavine,* 415 U.S. 528, 548, 94 S.Ct. 1372, 1385, 39 L.Ed.2d 577 (1974). Second, the issue of whether or not the trustees should be made to respond for damages for breaches of fiduciary duties is entirely separate from the issue of the declaration of the rights of the parties under the stock purchase agreement and fairness dictates that they be treated separately. *Network*

---

12. For example, the defendants' allegations (the first alleged "scheme" referred to *supra*) that the trustees fraudulently induced them to enter into the stock purchase agreement is inaccurate in that the uncontradicted trial evidence established that the arrangement was orchestrated by the Cohen Group to safeguard the value of the business while Robert Cohen was in federal prison.

13. To the extent that the order of September 23, 1987, dismisses the breach of fiduciary duties claims with prejudice, I will, on application of the defendants, correct the order to dismiss these claims without prejudice.

*Project v. Corporation for Public Broadcasting,* 561 F.2d 963, 970 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978). Third, presentation of these separate issues to the jury would have unreasonably confused them in deciding the central issue in the case. *See Cancellier v. Federated Dept. Stores,* 672 F.2d 1312, 1318 (9th Cir.), *cert. denied,* 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982). Finally, defendants are not prejudiced by remitting their fiduciary duty claims to the state courts in that, because of the separateness of the issues involved, the defendants will not "irretrievably" lose any rights if they cannot "assert them in an ongoing action in federal court." *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 376, 98 S.Ct. 2396, 2404, 57 L.Ed.2d 274 (1978).

With respect to the remaining claims of the trustees, after three weeks of trial it became apparent that the factual predicates of these claims were tenuous at best. The *bona fides* of each of the parties was fully litigated and no evidence appeared that would support plaintiffs' claims based on fraud, the securities laws, ERISA, or implied covenants of good faith and fair dealing. Moreover, it is clear that a definitive resolution of the contract claim in this case would resolve all other contentions raised by the parties.

### VIII. *Conclusion*

For the reasons set forth above, I have determined that a final order should be entered in this case disposing of all of the claims of the parties in order that the appellate process may proceed expeditiously and in order to resolve the uncertainties created by this litigation as soon as possible.

### ADDENDUM A

### ORDER

AND NOW, this 23rd day of September, 1987, after trial commencing on August 27, 1987, before the Court and a jury, and the Court having submitted special interrogatories to the jury, and the jury having unanimously found on September 18, 1987, that the fair market value as of January 31, 1985, of the 56.2% majority block of stock which is the subject of the Stock Sale Agreement of January 31, 1985, (the "Contract") between the plaintiffs Joseph L. Castle, II, Alan M. Feldman, Miguel A. Mora and Robert S. Seltzer, the Trustees of Psychiatric Hospitals of America, Inc. Employee Stock Ownership Plan and the defendants is Fifteen Million, Eight Hundred Thousand dollars ($15,800,000),

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. On Counts III and VI of the complaint in this action, and the First and Third Causes of Action of the counterclaims asserted by defendants, this Court hereby declares that the fair market value as of January 31, 1985, of the 56.2% majority block of stock sold pursuant to the Contract is Fifteen Million, Eight Hundred Thousand Dollars ($15,800,000), which amount constitutes the "Stockholders' Value" (excluding interest) under the Contract and, in particular, Section 6 thereof.

2. Plaintiff Trustees on behalf of the beneficiaries of the Psychiatric Hospitals of America, Inc. Employee Stock Ownership Plan are entitled to exercise all their rights and options under the Contract, including, but not limited to, consummating the purchase of the 56.2% majority block of stock at Fifteen Million, Eight Hundred Thousand Dollars ($15,800,000) plus such interest as may be applicable, pursuant to the payment terms set forth in the Contract or as otherwise ordered by the Court.

3. All of the remaining claims of the parties are DISMISSED with prejudice.

4. This is a final order and the Clerk is directed to close the docket of the within case.

BY THE COURT:
(s) Edward N. Cahn
Edward N. Cahn, J.

### ADDENDUM B

### ORDER

AND NOW, this 26th day of October, 1987, upon consideration of defendants' Motion to Alter, Amend or Grant Relief from Judgment, plaintiffs' response there-

to, and the argument of counsel, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that this court's order of September 23, 1987 is MODIFIED as follows:

1. Plaintiffs shall have until March 31, 1988 to consummate the purchase of the 56.2% majority block of stock at Fifteen Million, Eight Hundred Thousand Dollars ($15,800,000) plus such interest as may be applicable, pursuant to the payment terms set forth in the Contract as modified by this order.

2. If the plaintiffs are unable to consummate the purchase of the 56.2% majority block of stock on or before March 31, 1988, the defendants may sell the 56.2% majority block to the Ramsey Group, or if the Ramsey offer has been withdrawn, to any other interested party, provided that the amount for which the stock is sold exceeds Fifteen Million, Eight Hundred Thousand Dollars ($15,800,000) plus applicable interest as defined in the Stock Sale Agreement to the date of purchase.

3. In the event that a sale takes place pursuant to Paragraph 2 of this order, from the proceeds thereof Fifteen Million, Eight Hundred Thousand Dollars ($15,800,-000) plus applicable interest as defined in the Stock Sale Agreement to the date of purchase, shall be placed in an interest bearing escrow account pending the final resolution of this and all related cases.

4. This is a final order and the Clerk is directed to close the docket of the within case.

BY THE COURT:
(s) Edward N. Cahn
Edward N. Cahn, J.